O’NIELL, C. J.
 

 The defendant, appellant, stands convicted of murder and. condemned to suffer the penalty of death. He was indicted jointly with one Thomas Pickelheimer for the murder of Thomas H. Register, on the finding of a dead body, said to be Register, in a slip of woods in the outskirts of New Orleans. The evidence against Scarbrough and Pickelheimer was only circumstantial, except that a confession was made by Scarbrough, saying that he, in company with Pickelheimer, took Register out into the woods, in an automobile, for the purpose of killing and robbing him, and that Pickelheimer then and there shot and murdered him with a pistol which Scarbrough had given to Pickelheimer for the purpose. Scarbrough contends that the confession was obtained by undue influences on the part of the police officers and was therefore not admissible in evidence as a free and voluntary confession.
 

 The homicide is alleged to have been committed on the 19th of December, 1927. The dead body was found by a hunter on the 22d of that month. Scarbrough had been arrested the night before, on a charge of shooting and wounding a woman in a drinking establishment in New Orleans. The police officers obtained a statement from him on the 26th of December, in which he acknowledged having brought Register to Pickelheimer in the evening of the 19th of December, and
 
 *489
 
 having lent his pistol to Pickelheimer, but denied having any knowledge of the killing. On the 28th of December, Scarbrough was brought by the police officers to the district attorney’s office, and there made the confession that he and Pickelheimer had conspired to murder and rob Register, and that he, Scarbrough, having lent his pistol to Pickelheimer for the murderous purpose, drove the automobile containing Pickelheimer and Register into the woods, where Pickelheimer murdered Register.
 

 A preliminary examination was had, on the request of the state, and, on the 6th of January, 1928, the court ordered both of the accused parties committed to await the action of the grand jury. Pickelheimer was represented by counsel employed by him, and, as Scarbrough was unable to employ an attorney, the court appointed as his counsel the attorney who is graciously representing him yet. Both of the parties accused were present and represented by counsel, who cross-examined the state’s witnesses, during the preliminary hearing, no objection whatever being made to the proceedings. The indictment was rendered by the grand jury on the 20th of January, and the parties accused were arraigned on the 23d of January, 1928, and pleaded, “Not guilty.”
 

 On the 13th of February, an agreement was made between the assistant district attorney, on the one hand, and Scarbrough and his attorney, on the other hand, that Scarbrough should be allowed to plead, “Guilty without capital punishment,” and be sentenced to life imprisonment in the penitentiary, in consideration for his being a witness for the state in the trial of Pickelheimer. When the case was called for trial, on the 23d of February, the assistant district attorney asked for and obtained a severance, and, on his motion, the trial of Scarbrough was postponed indefinitely, and the trial of Pickelheimer alone was proceeded with. Scarbrough fulfilled his promise by testifying faithfully as a witness for the state against Pickelheimer; but the jury found him not guilty. Thereafter Scarbrough refused to plead, “Guilty, without capital punishment,” although the state was willing at all times to accept the plea: Scarbrough was then put on trial and found “guilty as charged.” It is from that verdict and the consequent- death sentence that he prosecutes this appeal. The record contains 14 bills of exception.
 

 The first bill of exceptions has reference to the testimony of Joseph Q. Bovoi, a witness for the state, who testified that, as an employee of the Driverless Gar Company, he rented a Ford automobile, at 12:20 p. m. on the 19th of December, 1927, to a man who gave his name as Richard B. Prout, and his address as 532 Boubon street, and who paid $5, as a deposit for the hire of the car. The witness was asked whether there was any agreement between him and Prout as to how long the car was to be out. The attorney for the defendant objected on the ground that any conversation had between the witness and Prout, not in the presence of the defendant, would be hearsay evidence; and to the overruling of the objection the attorney reserved a bill of exceptions. There was no merit in the objection, for the district attorney’s theory was that Prout had rented the automobile for and on behalf of the defendant; and, therefore, subject to its being eventually proven that Prout acted as the agent for the defendant, evidence of an agreement on the part of Prout as to how long he was to use the car was admissible. In fact, the witness denied that there was any such agreement. Being confused perhaps by the interruption, he first answered “Yes,” but the question was repeated immediately and he answered: “No, sir” — that there was no agreement as to how long the car was to be used.
 

 The second bill of exceptions has reference to the testimony of Charles R. Nail, a witness for the state, who testified that he
 
 *491
 
 and the witness Lovoi were employees of the Driverless Oar Company on the 19th of December, 1927, and that the Ford car which Lovoi had rented to the man named Prout at 12:20 that day was returned to him, Nail, at 10:55 that night by a man whom he described as a short, stocky man, of fair complexion and light hair; which description, as we understand, as far as it goes, is a description of the accused, Scarbrough. The witness testified not only from his personal knowledge but also from the records made by a registering machine called a “calculagraph.” He said that the record made by him when the car was returned showed that it had traveled 61 miles, and that there was an excess charge of $3.65 due, over and above the $5 which Prout had deposited, and that the man who returned the car paid $1, leaving a balance of $2.65 due, and said that he was not Prout, but that he would see Prout, and that Prout would call the next day and pay the balance. The defendant’s attorney objected to the testimony on the ground that it was hearsay, and, to the overruling of the objection, reserved a bill of exceptions. The ruling was correct. The objection went to the effect and not to the admissibility of the evidence, for its importance depended altogether upon the state’s proving that the man who made the statements, and whom the witness described, was in fact the party on trial.
 

 The third bill of exceptions is closely related to the second. It is said in appellant’s brief that this third bill was reserved to a remark made by the assistant district attorney when the objection was made to the testimony given by the witness, Charles R. Nail; but the record shows that the objection had reference only to the testimony given by the witness, and that the only bill reserved was to the overruling of the objection to the testimony. As soon as the defendant’s attorney objected to the testimony, which was immediately after it was given, the assistant district attorney arose, and, addressing the judge, said that he gave his assurance as a gentleman and a lawyer that he would connect the statements attributed to the short, stocky blonde man with the defendant on trial, and suggested that if he failed so to do the judge should later instruct the jury on the subject. The defendant’s attorney did not protest against the remarks made'- by the assistant district attorney, or request any instruction by the judge, or invoke any ruling on the subject. There is therefore no merit in this bill of exceptions.
 

 The fourth bill has reference to the testimony of the coroner, as to the identity of the dead body on which he made an autopsy. The objection, which was not made until the testimony was all given, was that the coroner’s knowledge of the identity of the dead body was only a matter of hearsay. There was no good reason for objecting to the testimony, because the coroner did not say who the dead man was, but merely said that some one had come into the morgue and identified the body. It appears from the record made at the time of the objection that no bill of exception was then taken to the judge’s ruling. If a bill of exceptions was taken, there was no merit in it.
 

 The fifth bill relates to the testimony of Norman E. 'Ford, a witness for the state, who identified the dead body in the morgue as that of Thomas H. Register. Ford’s testimony was taken during the preliminary examination, and the transcript of it was introduced in evidence on the trial of the case before the jury, because the witness had left the city and could not be found. The defendant’s attorney, objected to the offering on the ground that it was not sufficiently proven that the witness could not be found. We agree with the district judge that1 the proof was abundant that the witness, who was a sailor, classified as an able-bodied
 
 *493
 
 seaman, having his residence and all of his relations in Lambertville, N. X, had departed from New Orleans on a ship bound for Genoa, Italy, without any intention ever to return to New Orleans. A deputy sheriff did all that could be done in attempting to serve a subpcena upon the witness, by going to the house where the witness had resided during his brief stay in New Orleans, and being informed by the landlady that the witness had departed permanently. When a party accused has been confronted with the witnesses against him in a preliminary examination, and has had the opportunity of cross-examining them, their testimony so taken and recorded is admissible on the trial of the case before a jury, if it be proven that the attendance of the witness cannot be had. State v. Coudier, 36 La. Ann. 292; State v. Laque, 41 La. Ann. 1072, 6 So. 787; State v. Riley, 42 La. Ann. 995, 8 So. 469; State v. Tyler, 46 La. Ann. 1269, 15 So. 624; State v. Timberlake, 50 La. Ann. 312, 23 So. 276; State v. Kline, 109 La. 621, 33 So. 618; State v. Banks, 111 La. 22, 35 So. 370; State v. Wheat, 111 La. 860, 35 So. 955; State v. Bollero, 112 La. 850, 36 So. 754.
 

 The sixth and seventh bills of exception were taken to the judge’s ruling that the defendant’s confession was admissible in evidence. The objection to the introduction of the confession was, not only that it was procured by undue influences on the part of the police officers, but also that, inasmuch as the testimony which the defendant gave as a witness for the state in the trial of Pickelheimer was merely a repetition of the confession, the testimony was procured in consideration for the promise of immunity from the death penalty. The latter objection was not well founded, because the confession, which was all that was offered in evidence, was made before the agreement was made that the defendant would be allowed to plead “guilty without capital punishment,” and be sentenced to life imprisonment, in consideration for h'is testifying faithfully as a witness for the state against Pickelheimer. The state did not attempt to introduce in evidence in the trial of Scarbrough the testimony which he had.given as a witness for the state in the trial of Pickelheimer, under the promise of immunity from the death penalty. The only confession that was introduced or offered in evidence was the confession which Scarbrough made in the district attorney’s office on the 28th of December, 1928; and the only question, with regard to its admissibility, is whether it was induced by undue influences exerted by the police officers before they brought the prisoner to the district attorney’s office. Nothing was done in the district attorney’s office to induce the prisoner to make a confession. He was brought there from the Ninth Precinct Police Station by the superintendent of police, the chief of detectives, and a patrolman from the Ninth precinct, and made the confession in their presence, to an assistant district attorney, whose stenographer took down the confession, in the form of questions, asked by the assistant district attorney and by the superintendent of police and the chief of detectives, and answered by the defendant.
 

 The defendant was first arrested at 9:30 a. m. on Wednesday, the 21st of December, 1927, on the charge of having shot and wounded a woman the night before, and he was placed in the parish prison, where he belonged. When the body of the murdered man was found, and an investigation into that crime was begun, suspicion fell upon Scarbrough, because a bullet taken from the dead body corresponded in' a general way with cartridges found in the possession of Scarbrough at the time of his arrest. It is admitted that the district attorney therefore decided “to place the defendant back in the hands of the police so that he could be used in the matter of identification and the gen
 
 *495
 
 eral investigation,” which is usually made by the police department in such cases. Accordingly, the superintendent of police was notified that Scarbrough would be released from the parish prison, and was instructed to have him rearrested at the prison gate. The policemen did rearrest, the defendant as soon as he came out of the prison, and took him to the First Precinct Police Station, nearby, and, suspecting that certain stains on his clothes were blood stains, had him take off his clothes and put on a ragged pair of trousers and shirt which the police officers gave him. That was in the forenoon of the 24th of December, which was a cold day. The prisoner was then booked on the charge of murder, at the First Precinct Police Station, and was taken immediately to the Ninth Precinct Station, up in Carrollton, about four miles away, and was kept there until he decided to make a confession. No reason whatever is given for taking the prisoner from the First Precinct Station, near the parish prison, to the Ninth Precinct Station, several miles away, except that the chief of detectives, when asked what the reason was, said: “Because it was quiet up there.” He admitted that that police station was “an antiquated jail,” with brick cells, having no means of being heated, and having the glass broken out of the barred windows, and he admitted that he had heard complaints of the cells being inhabited by rats. The defendant testified, in support of his charge that the confession was induced by cruel treatment during his four days and nights of confinement in the Ninth Precinct Station, that he was given no food except one sandwich a day, no drinking water except what he found in the reservoir above the toilet, and no bedclothes except one blanket which was only given to him on the night of the 26th of December; and that the policemen came into the cell every hour of the night and day and prodded him with questions, at the same time kicking him on the legs and urging him to tell what he knew about the murder, and that a clerk from the office, while questioning him, placed a pistol under his left ear and threatened to kill him as he had killed the other fellow. We are not disposed to believe that part of the defendant’s testimony, or to believe that any physical injury was inflicted upon him by the police officers in their desire to procure a statement from him, but we are of the opinion that it was incumbent upon the state to contradict • the defendant’s testimony by calling as witnesses the police officers who were in charge of the Ninth Precinct Police Station at the time when the defendant was imprisoned there. He testified also that, in the effort to obtain a confession from him, the chief of detectives told him that he would be allowed to plead guilty of manslaughter, and would not be tried for murder, if he would consent to make a statement; and, although the chief of detectives testified as a witness for the state in support of the confession, he did not deny the defendant’s statement that he, the chief of detectives, had told the defendant that he would be allowed to plead guilty of manslaughter if he would consent to make a confession. The only questions that were asked the chief of detectives, as a witness, in that respect, were, first, whether any inducement was held out to the prisoner after he had told the chief of detectives, on the 28th of December, that he wanted to make a statement; and, second, whether the assistant district attorney, or the chief of police, or chief of detectives, offered any violence to induce the confession.
 

 It will not do to say that the testimony of the defendant that the confession was extorted by cruel treatment and by a promise of immunity was so thoroughly unworthy of belief that the police officers were not called upon to deny it. Such a doctrine or ruling would deprive an accused person of
 
 *497
 
 the protection vouchsafed by the Constitution. The prisoner, in this case, was not only a competent witness under the law, but was deemed sufficiently worthy of belief for the state to rely upon his testimony and vouch for his veracity in the prosecution of the codefendant, Piekelheimer.
 

 Aside from that part of the defendant’s testimony which was uncorroborated— and aside from the failure of the police officers to contradict it — there are some outstanding and acknowledged facts which leave no doubt that the confession made on the 28th of December was induced by the hardships and exposure to cold which the prisoner was compelled to suffer in the Ninth Precinct Police Station until he consented to make a confession. It was proven beyond all doubt, and was not denied by any one, that he was sick with cold and sore throat and in a wretched condition when the police officers wrapped a blanket about him and brought him to the district attorney’s office. When he consented to make a confession on the night of the 26th of December, he was brought to the office of the chief of detectives, on the latter’s request, but, after arriving there, and being given medicine by a druggist who was sent for to serve as a witness, the prisoner refused to make a confession or statement regarding the crime. He was replaced in the automobile by the policemen to be returned to the Ninth Precinct Police Station, but on the way he consented again to make a statement; whereupon the policemen stopped the automobile and telephoned back to the office of the chief of detectives to have the druggist wait there to serve as a witness. The statement which the prisoner then made was not satisfactory to the police officers, for it tended to incriminate only Piekelheimer, and not Scarbrough; 7and so the police officers returned the prisoner immediately to the Ninth Precinct Police Station, and kept him there until he made the confession which satisfied the police officers. When that was done, ,the prisoner was returned, not to the Ninth Precinct Police Station, but to the parish prison, where he belonged. It is said that the reason why the prisoner was not returned to the parish prison sooner is that no formal charge of murder was made against him until he acknowledged his guilt; but the evidence is so convincing that we have no doubt that the 'only purpose of subjecting the prisoner to the hardships of the Ninth Precinct Police Station was to induce him to make a confession rather than to continue the suffering.
 

 We have no unfavorable criticism to make of the district attorney or his assistants. On the contrary, we have often found great pleasure in observing their efficiency and devotion to duty. We do not believe that they knew that any undue influence was brought to bear upon .the prisoner before he was brought to the district attorney’s office and announced his desire to make a confession. Nor have we any desire, by our ruling 'in this case, to hinder the police department in their conscientious and praiseworthy efforts to expose criminals and bring them to justice. But we are constrained to find that some of the officers, in this instance, were too zealous in the performance of what they conceived to be their duty. The Constitution and the laws of this state do not forbid a fair and reasonable asking of questions of a prisoner suspected of a serious crime, but they do forbid the use of harsh or cruel treatment tending to induce a confession of guilt. The language of the new matter in the eleventh section of the Bill of Rights is very appropriate to this case, viz.:
 

 “No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made.”
 

 
 *499
 
 As long as these provisions are in the Constitution we must enforce them, for no other reason than that our oath of office compels it. In the case of State v. Roberson et al., 157 La. 974, 103 So. 283, a confession of the crime of murder was held to be inadmissible as evidence, because it was obtained by the jailers in charge of the prisoner by persistently questioning him for half an hour one day, half an hour the next day, and three or four hours on the third day. The court said:
 

 “It does not appear that Hayes [who made the confession] was subjected to any torture or other harsh methods for the purpose of extorting a confession, but he says that he made the confession for the purpose of ridding himself (‘getting shet’) of his jailers who seemed bent on obtaining his confession of the crime.”
 

 After quoting from the case of Ziang Sung Wan v. United States, 266 U. S. 1, 45 S. Ct. 1, 69 L. Ed. 131, and citing Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568, and State v. Alexander, 109 La. 557, 33 So. 600, and State v. Albert, 50 La. Ann. 481, 485, 23 So. 609, the court said:
 

 “But our Constitution of 1921 goes much further than does the Constitution of the United States, or any former Constitution of this state, perhaps even further than the Constitution of any other state. It says:
 

 “And our conclusion is that any persistent effort to obtain a statement from a person in custody, by repeatedly subjecting him to cross-examination after he has refused to make such statement, is ‘treatment designed by effect on body or mind to compel a confession of crime’; and that a confession so obtained cannot be used against an accused.”
 

 The ruling in the latter case was affirmed in a subsequent appeal by the defendant, Hayes. See State v. Hayes, 162 La. 310, 110 So. 486.
 

 It is said in the brief filed by the. state that the defendant, on the witness stand, acknowledged that his confession made on the 28th of December, 1928, was true. The transcript of the testimony seems, in a measure, to bear that out; but there appears to be some confusion in the record of the testimony, for the witness repeatedly denied that there was any truth in the confession, and it seems unreasonable that he intentionally, or with full understanding of the question, acknowledged his guilt while testifying before the jury. At the conclusion of a long cross-examination, the record of the testimony is as follows:
 

 “Q. Do you contend now that any of the statements made by you in the statement of December 26th are untrue?
 

 “A. I can’t get you.
 

 “Q. I say, do you contend now that any of the statements made by you in that long statement, in the presence of Mr. Walsdorf, or any of the statements made in that-written statement, are untrue, or are they true? (At this point there was an objection and a ruling.)
 

 “A. No. They are untrue.
 

 “Q. Do you contend that the statements made by you in the statement of December 26th, in the presence of Mr. Walsdorf, are untrue; or are they true?
 

 “A. They are untrue.
 

 “Q. The statement made to me by you on December 28th — are all the statements made in that confession untrue?
 

 “A. Yes, sir.
 

 “Q. All of them are untrue?
 

 “A. Yes, sir.
 

 “Q. On December 28th — the statement you made to me — do you now contend that all of them are untrue?
 

 “A. No, sir.
 

 “Q. All of the statements made by you in the statement of December 28th are true?
 

 “A. Yes, sir.
 

 
 *501
 
 It seems that the defendant’s attorney did not observe that he had made contradictory answers, for he was not re-examined on the subject, or given an opportunity to explain his answers, by having the matter bx*ought to his attention. It is, therefore, very probable that either the witness or the stenographer mistook the word “untrue” for the word “true,” or vice versa. Be that as it may, the confession was not a free or voluntary -confession, and was therefore not admissible in evidence, no matter how true it may have been. Professor Wig-more, in his treatise on the subject (volume 1, p. 1001), says that the cases in which false confessions have been “induced by an important advantage” have been of the rarest occurrence, and that no trustworthy 'figures of authenticated instances exist, although he cites five historical and notable instances where false confessions of guilt were obtained. It will not do, though, to confuse the deadly proof which results from a free and voluntary confession with the proof which must first be adduced that the confession was a free and voluntary confession. Our conclusion is that the confession obtained from the defendant in this case was not shown to be a voluntary confession, and that the verdict and sentence therefore must be set aside and a new trial granted.
 

 The eighth bill of exceptions was reserved to the overruling of an objection to the introduction in evidence of an automatic pistol, a magazine, thx’ee unexploded cartridges, three steel-jacket bullets, and a man’s cap which was found at the scene of the homicide. The objection, in substance, was that there was no identification of the articles as belonging either to the defendant or to Thomas H. Register. Our opinion is that the articles were admissible as a part of the circumstantial evidence against the defendant. The automatic pistol, the magazine, and the three unexploded cartridges were identified as those which were found in the defendant’s bedroom, and acknowledged to be his, at the time when and place where he was first arrested. The three steel-jacket bullets were identified by the coroner as those which he had extracted from the dead body which was identified by the witness, Norman E. Ford, as the body of Thomas H. Register. The cap which was introduced in evidence was identified as having been found near the dead body; and the cap had a bullet hole in it, and so had the dead man’s head. The articles, therefore, were all admissible in evidence.
 

 The ninth bill of exceptions was reserved to a ruling sustaining an objection made by the assistant district attorney, which prevented the defendant’s giving an explanation of one of his answers as a witness in the ease. It is admitted that the witness was allowed afterwards to complete his answer and make a full explanation. There is therefore no merit in this bill of exceptions.
 

 The .tenth bill was reserved to the overruling of an objection to a question propounded by the assistant district attorney
 
 to the
 
 defendant, as a witness, in impeachment of his testimony. The question was whether .the defendant was once arrested in the state of Michigan, for robbery, with a gun, and sent to the penitentiary for a term of 5 to 15 years for highway robbery. The objection, in substance, was that the best evidence of the occurrence referred to would be a record of the judicial proceedings had in Michigan. We do not think so. The record would not have been sufficient proof without an identification of the defendant as the party referred to therein. No one knew better than the defendant himself whether he had been arrested and convicted and sentenced to imprisonment for highway robbery in Michigan. He answered: “Yes, sir.” There is no merit in this bill of exceptions.
 

 The eleventh bill was reserved to the
 
 *503
 
 overruling of an objection to another question which the assistant district attorney asked the defendant in attacking his credibility as a witness. The question was whether he was then a paroled violator of the law. The objection was that .the question of good or bad character of the defendant was not an issue in the case. His character for peace and quiet was not at issue, but his character for truth and veracity was; and the evidence was relevant to the question of character for truth and veracity. There is therefore no merit in this bill of exceptions.
 

 The twelfth bill was reserved to the overruling of the defendant’s motion for a new trial. The motion was a repetition of the complaints which we have already disposed of, and an allegation of newly discovered evidence. There is no necessity for considering the question of newly discovered evidence, since we have concluded that a new trial must be granted, which will furnish an opportunity for the introduction of any newly discovered evidence.
 

 The thirteenth bill of exceptions was reserved to the overruling of what the appellant’s attorney calls a plea of immunity. The plea, in substance, was that, inasmuch as the defendant was promised immunity from the sentence of death, in consideration for his testifying as a witness for the state in the prosecution of the codefendant, Pickelheimer, the court should postpone the imposing of the death sentence until the board of pardons should have an. opportunity to consider and act upon the case. It is conceded that there is no statutory authority for any such plea; and our opinion is that the district judge had no authority to postpone the imposing of the sentence. Inasmuch as we have concluded that the verdict and sentence must be set aside and a new trial granted, there is, really no necessity for considering the so-called plea of immunity.
 

 The fourteenth bill of exceptions was reserved to the overruling of a motion in arrest of judgment. The argument in support of the motion seems to be that the defendant obtained immunity from prosecution for murder when he fulfilled his agreement to testify faithfully as a witness for the state in the trial of Pickelheimer. But the fact is that that was only a part of the agreement. The other part, which the defendant refused to carry out, was that he should plead “guilty without capital punishment.” When he refused to withdraw his plea of “not guilty,” the state had no alternative but to try him for murder, as if no agreement to plead “guilty without capital punishment” had been made. The reason which the defendant gave for refusing to carry out his agreement to plead “guilty without capital punishment” was that he had not agreed to plead guilty of the crime of murder, and did not understand that, by agreeing to plead “guilty without capital punishment,” he agreed to plead guilty of the crime of murder. That, of course, is a matter of no importance, because the state had no means of compelling the defendant to plead “guilty without capital punishment,” however well he may have understood the agreement.
 

 The verdict and sentence are annulled, and the case is ordered remanded for a new trial.
 

 LAND and THOMPSON, JJ„ dissent.