146 So. 684

## STATE v. SILSBY.

### No. 32049.

Jan. 3, 1933.

Rehearing Denied Feb. 27, 1933.

Maurice R. Woulfe, Girault Farrar, James O. Brooks, and George M. Brooks, all of New Orleans, for appellant.

Gaston L. Porterie, Atty. Gen., and Eugene Stanley, Dist. Atty., and J. Bernard Cocke, Asst. Dist. Atty., both of New Orleans, for the State.

ST. PAUL, Justice.

The defendant was convicted of robbery. His appeal brings up five bills of exception, which, however, present only three points.

A confession was introduced in evidence against him over his objection (1) that the prosecuting officer had not made mention in his opening statement to the jury of his intention to use any confession against the accused, and (2) that the confession used was not voluntarily given but extorted by threats and violence. He also complains (3) that the trial judge excluded certain evidence which he should have allowed.

We will consider these in reverse order.

## I.

■ The defendant was indicted for this offense jointly with the three following parties, to wit, Joseph Greco, William Kelly, and *Willie Martin;* but this defendant was alone *put on trial* for the offense, the case against his codefendants having been otherwise disposed of.

About the time of defendant's arrest, or shortly before that, Robert Martin, Desire Coroy, and Vincent Montalbano were arrested for a similar, but not for the same, offense.

On the trial of this defendant the corpus delicti was proven without objection, to wit, that on the day fixed in the indictment the Ewing Market Branch of the Canal Bank & Trust Company, in the city of New Orleans, was openly robbed in full daylight by four armed men, hooded or otherwise disguised.

Whereupon the state proceeded to lay down the foundation for introducing a confession by this defendant.

When the state had finished its evidence touching the manner in which the confession had been obtained, the defendant took the stand and testified that he had been deprived of sleep, water, food, and tobacco, beaten, and threatened with further beating and with death unless he confessed. Wherefore he made no confession, but in fear answered, "Yes," to anything he was asked.

Thereupon (quoting from the bill of exception which we are now considering), "defendant offered in his behalf the witnesses Robert Martin, Desire Coroy, and Vincent Montalbano, and the original photographs showing the physical condition of these witnesses from beatings administered by the police of the City of New Orleans whilst these witnesses were under arrest, together with the witness H. J. Harvey, photographer [who took the photographs], and the report of Coroner George H. Roeling [who physically examined the witnesses], which evidence of said witnesses would corroborate defendant herein in his testimony that said confession was induced from him through fear, duress, bodily punishment, and cruel and unusual punishment, but which testimony of said witnesses and evidence so offered the court excluded and refused to allow to go before the jury, withdrawing the jury and not allowing them to hear same."

We think the evidence was properly excluded. Proof that the police in general habitually or constantly maltreat their prisoners, or that the particular police officers who had this defendant under arrest do so, would be admissible to corroborate defendant's testimony herein, but not proof that some other (known or unknown) officer or officers maltreated some other prisoner.

And it is just this last sort of evidence that defendant sought to offer, to wit, the

testimony of Robert Martin, Desire Coroy, and Vincent Montalbano, that they were beaten by "police officers," whose names two of them declined to give and the third was not even asked.

In other words, evidence that *all* police officers are of brutal character, if believed, or evidence that the particular officers who had this defendant under arrest are of brutal character, if believed, would be relevant to corroborate the testimony of this defendant that he was brutally treated, as he testified; but evidence that some *other* police officer, known or unknown, is of brutal character, even if believed, is wholly irrelevant for such purpose.

## II.

The defendant testified that the confession was not voluntarily given, but forced from him by cruel treatment and threats; that he was deprived of sleep, water, food, and tobacco; beaten and threatened with further beating and with death unless he confessed; that he made no confession, but merely answered, "Yes," to anything he was asked.

He is contradicted on every point.

The testimony on the admissibility of the confession takes up 70 typewritten pages of the transcript. An epitome of it by the state takes up 25 printed pages of its brief. We will ourselves not attempt to epitomize, but will confine ourselves to pointing out the conflicts between defendant's testimony and that of the witnesses produced by the state.

The first two of such conflicts are over collateral matters not particularly relevant. The offense was committed April 30, 1931.

The first information against this defendant was filed July 6th (afterwards nolle prosequied and a new information filed). On Friday, July 10th, Corporal Joseph Schwehm, of the New Orleans Police Force, left New Orleans for Hot Springs, Ark., for the purpose of apprehending defendant. He left New Orleans by train at 6 o'clock p. m. and arrived at Hot Springs the next evening, Saturday, at the same hour. Defendant was arrested at 11 p. m. that night, by Corporal Schwehm and the Hot Springs police, and taken at once to a police station. The return trip was made by automobile, using two automobiles, one belonging to the defendant, and one to the chief of police of Hot Springs. Defendant and his captor were accompanied on the trip by the defendant's wife, the Hot Springs chief of police and his wife, and the Hot Springs chief of detectives. They left Hot Springs at 2 o'clock Sunday morning, drove continuously for 24 hours, and arrived in New Orleans between 2 and 3 o'clock Monday morning; the defendant having waived extradition.

Here is the first conflict: Defendant testifies he waived extradition only because he was promised by Schwehm, and made it a condition, that he would not be "third-degreed" by the police on his return. Schwehm testifies that he waived extradition because he wanted his wife and his car, which he had with him, returned to New Orleans, which he (Schwehm) agreed to and which is the reason that the return trip was made by automobile instead of by train. Defendant's wife, who must have known, was present at the trial, but was not called to corroborate her husband.

Here is the next conflict: He testified that on arrival in New Orleans, between 2 and 3 o'clock Monday morning, he was first taken to police headquarters, where he "signed extradition papers," and was then taken in the patrol wagon (but *not* by Schwehm) to the Ninth precinct station. Schwehm testifies that he (Schwehm) personally took the defendant directly to the Ninth precinct, the nearest, immediately upon entering the city. Schwehm is corroborated by Police Clerk Joseph Owens, who testified that Corporal Schwehm personally delivered the defendant to the Ninth precinct station a little after 2 o'clock in the morning (Monday, July 13th). The defendant's wife who made the return trip with him, though present at the trial, was not called to corroborate him.

Here is another conflict. He was asked when was the last time he had "been allowed" to go to sleep (prior to the Tuesday evening on which he was said to have made a confession). He answered, "Well, the last sleep I had was Friday Night." And again, when he was asked if he could identify a statement, which it was said he had been asked to sign but refused, he said: "I couldn't tell you whether it was the statement or not, You understand I had had nothing to eat, *no sleep*, [nor] water for a long time," leaving the inference that he had not *"been allowed"* to sleep—a most refined species of torture. Here he comes in conflict with a physical fact and with himself. Of course, he got no sleep from Saturday morning until Monday morning, nor did any one else of those who made the trip from Hot Springs to New Orleans, but *that* was the result of circumstances and not of cruelty; and he states,

in another part of his testimony, *why* he had no sleep after 2 o'clock Monday morning, thus: "What did you have to sleep on? Well, there was a cot there, but you couldn't hardly sleep on that. It was all torn, and sank to the ground. In fact I didn't sleep." But, according even to his own testimony, he was not disturbed by any one from the time he was put in the cell, about 2 o'clock, "until next morning, * * * when I saw Chief Grosch, and [Captains] Malone and Daniels," which was after 11 o'clock.

He testified that there was a bucket of water in his cell, "but they took it out when they placed me in the cell," and did not replace it; that he was given nothing to eat and deprived of his cigarettes. Police Doorman Maus testified that he took the bucket of water out of the cell only to refill and replace it; that defendant was given coffee and sandwiches in the morning, and had himself sent out and purchased cigarettes, which *the doorman personally handed to defendant.*

He testified that he was taken from the Ninth precinct station to the Seventh precinct station before he was taken to the detective headquarters, where the alleged confession was taken. Captain Daniels, who (as also Captain Malone) works under instructions coming directly from the district attorney's office, and Chief of Detectives John Grosch, both testify that defendant was taken directly from the Ninth precinct to detective headquarters and was not taken to the Seventh precinct at all.

He testifies that at detective headquarters, where his wife was, he was not allowed to confer with her or even talk to her. Chief

Grosch testifies that he *was* allowed to talk to his wife, that she *did* talk with him, and "sat alongside of him for one hour" and "cried over some things that he told her"; and he pointed out the lady sitting in the courtroom dressed "in green"; and she was not called to deny this.

He testified that Mr. Culligan, an assistant district attorney, came to detective headquarters to take down his statement, and took down in shorthand questions propounded by Chief Grosch, to which defendant invariably answered, "yes," "all the time Yes," "always Yes; no No's." Mr. Culligan testifies that defendant dictated to him *currently* three different statements (about three different occurrences, not three separate statements about the same occurrence), only one of which is here involved; that he transcribed all three statements on the typewriter in the presence of defendant; that he asked defendant to sign these statements, but defendant refused to sign them "because Silsby said he did not want to be put in the position of ratting on these other men"; defendant's testimony, as to that, however, being that: "Mr. Culligan never asked me to sign.. Mr. Grosch says to Culligan: Give me that statement and I will have it signed. Mr. Culligan never asked me to sign that statement." And, in fine, he refused to sign it [for Grosch] "because it was not true."

The foregoing is a long and prosy recital, but necessary for showing, as above said, that defendant, in his testimony, is "*contradicted on every point*." As to which, *this* case is readily distinguished from the Scarbrough Case (State v. Scarbrough, 167 La. 484, 119 So. 523, 527), wherein although we were not disposed to believe the defendant's testimony that he had been threatened with death, or "that any physical injury was inflicted upon him by the police officers in their desire to procure a statement from him," nevertheless we were of the opinion that "it was incumbent upon the state to contradict the defendant's testimony by calling as witnesses the police officers who were in charge of the Ninth precinct police station at the time when the defendant was imprisoned there." For, "it will not do to say the testimony of the defendant that the confession was extorted by cruel treatment and by promises of immunity was so thoroughly unworthy of belief that the police officers were not called upon to deny it"; *especially* where the prisoner "was not only a competent witness under the law, but was deemed sufficiently worthy of belief for the state to rely upon his testimony and vouch for his veracity in the prosecution of the co-defendant." Wherein *again* the two cases are distinguishable, as will be seen later on.

So it seems hardly necessary to say that in this case *every* police officer who had the defendant in charge, from the time of his arrest to the time of his alleged confession, and every one who had aught to do with the receiving of the alleged confession, was called to testify that the confession was freely given, without violence, duress, threat, or promise, of any kind. To suppose otherwise *now* would be to doubt the oft and well-proven competency of the able district attorney and his able assistants. Accordingly, every such officer and person was called and did so testify herein.

The alleged statement of defendant was taken in the detective headquarters, which is in the new courthouse, where the police headquarters are and the district attorney has his offices; and where the superior criminal courts sit. The defendant was taken there about 1 o'clock; his alleged statement was taken by Mr. Culligan about 5 o'clock. Mr. Culligan gives the reason why it was not taken at once, thus: "Chief Grosch was talking to this man when I first went down there around one o'clock. He talked to him about ten different bank stick-ups, in some of which other accused had implicated him. Mr. Silsby denied several of the cases in which the other defendants had implicated him. It was checked back against the statements of the other defendants." "Grosch was interviewing this man and I dropped in from time to time." At one o'clock, "Mr. Grosch was still interviewing him." Same thing at 3 o'clock. "I will not say he [Grosch] was not ready [with this defendant, until 5 o'clock], but he was questioning him about these other matters, and the only matters we [of the district attorney's office] were interested in, were the matters in which he [this defendant] himself had personally taken part, not in transactions in which he had not taken part." "I never took a statement from Silsby until 5 o'clock." Prior to 5 o'clock in the evening, he (Culligan) "had conversations [with defendant] in regard to other matters, other than those three statements." The attitude and the mood of the defendant on the occasions of his visits was "very helpful towards Chief Grosch. In other words, he discussed every thing under the sun that Chief Grosch asked him about."

Chief Grosch testifies: "Frank Silsby and I had been very, very friendly. I done little things for Frank Silsby. Frank Silsby was arrested once under the name of Frank Matthews and I helped Frank Silsby because I thought he wanted to go straight." Defendant testified: "Well, my first connection with Grosch was when I was running a restaurant on Rampart street, and somebody wrote a letter about me and Grosch came down and picked me up for investigation, due to this letter." Further on: "I don't know what was in the letter. However, he released me. After he investigated and found out there was nothing true in the letter, he released me."

Grosch, Malone, and Daniels testify that they went to the Ninth precinct station about 11 o'clock Monday morning, and found defendant sitting on the cot; that he recognized Grosch, but refused to talk, and they left him; that in a few minutes he sent for Grosch alone, and that he and Grosch went into the office and spoke alone for half an hour; that defendant was then taken directly to detective headquarters. Chief Grosch testifies that defendant told him in the office that the reason he refused to talk at first was because he did not want to talk before the other two men. Corporal Schwehm testifies that on the way down from Hot Springs he questioned defendant about the robbery, who said: "Corporal, you been very nice to me on that trip, [but] I don't care to discuss the case. Chief Grosch is a personal friend of mine. If anything I got to say I am going to say it to him when I get back to New Orleans."

The three officers testify that after his talk with Grosch defendant was then taken directly to detective headquarters, where he made the alleged statement. We have already said that all three of them deny that any violence or bodily harm was done or threatened to defendant.

On the other hand, defendant testifies that at the Ninth precinct station "I was kicked in the stomach, kicked in the groin, and knocked on the floor and stomped on for fifteen or twenty minutes"; that he had no conversation with these people (Grosch, Malone, and Daniels) before that took place, "I never said a word. They never said a word." Then: "After they got through, I got up on the bunk and laid down. They brought some statements there and started reading them off. I was in such condition I really don't remember what the statements were or what they were about, and Chief Grosch asked me if I knew anything about them, and I told him No. He says, 'Well, you are going to know plenty about it before I get through with you.' I says, 'I suppose you're going to half kill me.' He says, 'It will be better than that; you are not going to live to tell the tale.'" "Well, it went on for fifteen or twenty minutes like that; and then they went out and then came back and started the same old thing again" [viz.] "punching and kicking," "and when they were kicking me and punching me Grosch asked me, Is this true and that true? I was in a dazed condition. I says Yes to several questions. * * * I didn't want him to kill me."

He testifies that he was then taken to the Seventh precinct station; and there, "It was the same thing. They took me upstairs, way in the back, in a back cell, and kept punching and kicking and threatening me, and told me I better say Yes. So finally they left me, and I imagine around one or two o'clock, about o'clock, I was taken from the Seventh in the patrol wagon to Chief of Detective Grosch's office"; that Grosch, Malone, and Daniels did not accompany him to the office but were there when he arrived; that upon his arrival "the doors were closed and the same third-degree methods were used again"; that "Grosch told me I better say Yes; if I didn't say Yes, he was going to take me out that night and shoot me in my head. So I was in [such] a condition—my groin was swollen three times the natural size, and my stomach—* * * I told Chief Grosch, then and there, I told him I will say Yes to anything you want me to say." Whereupon, he merely answered the questions put to him by Chief Grosch in monosyllables; "all the time Yes," "always Yes; no No's."

So the matter stands simply thus: Either this defendant is telling the truth, and *there is no truth to be found* in Corporal Schwehm, or Clerk Owens, or Doorman Maus, or Chief Grosch, or Captain Malone, or Captain Daniels, or Assistant District Attorney Culligan, *or else* Assistant District Attorney Culligan, and Captain Daniels, and Captain Malone, and Chief Grosch, and Doorman Maus, and Clerk Owens, and Corporal Schwehm, are all telling the truth, and this defendant is not. For there is no room whatever for any *mistake.*

Of these *eight* witnesses who testified on the confession, seven one way, one the other, the *seven* have not been impeached either for character or for veracity, nor was any

attempt made to do so. The *one* was impeached out of his own mouth; for his record was given by himself in the witness stand, and is this:

He is now under charges for four bank robberies in New Orleans and one in Jefferson parish. Besides the name Frank Silsby, under which he is here charged, he has five *alias* names, viz., Frank Matthews, Frank Cavanaugh, Frank McCourtie, Jack Taylor, and Franklin Jackson.

He was, a member of the "Egan's Rats" gang, of St. Louis, whatever *that* may be; but the very name is not reassuring, and although defendant knew that he was asked about his connection with this gang for the purpose of impeaching him, he did not protest against the inference.

He was known to Chief Grosch, who once arrested him for investigation and then released him, "under the name of Frank Matthews."

As Frank Cavanaugh, he was convicted of highway robbery in Minneapolis and sent to the State Penitentiary at Stillwater, Minn.; whence he was paroled, but returned later on for violating his parole.

As Frank McCourtie he was arrested at St. Louis, carrying a concealed weapon, and returned as above said to Stillwater Penitentiary.

As Jack Taylor, he was arrested at Kansas City for an assault and fined $200.

As Franklin Jackson, he was again arrested at Kansas City for larceny and as a fugitive and turned over to the sheriff of Clayton county, Mo.

As Frank Silsby, he was arrested at Chicago for an assault to rob, "but the case was thrown out of court."

The jury heard all the evidence as to the taking of the confession and did not believe the defendant; for he was convicted on the sole strength of that confession.

The trial judge also heard the evidence and did not believe the defendant; for he admitted the confession and approved the verdict.

And we ourselves can see no merit in the objection to the confession that it was not voluntarily given.

### III.

The other ground of objection to the admission of the confession is that the assistant district attorney who prosecuted for the state did not in his "opening statement" inform the court and jury and the defendant that he meant to offer in evidence a confession by the defendant.

The opening statement begins with an introduction, which is as follows (omitting what is inconsequential to the issue under consideration):

"Gentlemen: Under the provisions of the Criminal Code of 1928 [article 333] it now becomes obligatory upon the state's officer to make an opening address detailing *what he expects to prove*, upon which he asks you to convict. (Italics by this writer.)  *  *  *

"What I am about to say is not to be taken as proof. It is merely a résumé of what we expect to prove, in order to assist the jury in determining the value and placing the various parts of the evidence into the chain as they are introduced."

It then sets forth the corpus delicti, as we have herein above set it forth, but going more into the details of the criminal act; also the escape of the robbers, and the subsequent arrest of this defendant.

And then follows a detailed statement of this defendant's connection with the planning and perpetration of the crime, and his participation in the fruits thereof; which detailed statement (of "what the state will show," i. e. "expects to prove") is simply a clear, concise, and accurate recital of what the defendant confessed; not mentioning, however, that all this was to be shown by a confession given by the defendant.

It is of this failure to mention that the proof was to be made by a confession that the defendant complains.

Article 333 of the new Code of Criminal Procedure reads as follows:

"Art. 333. The jury having been empanelled and the indictment read, the trial shall proceed in the following order: The reading of the plea to the jury; the opening statement of the district attorney explaining the nature of the charge and *the evidence by which he expects to establish the same* [italics by this writer]; the opening statement by counsel for the defendant at his option," etc.

In State v. Ducre, 173 La. 438, 137 So. 745, 747, this court said (on rehearing) that: "The language of article 333 is *mandatory*," and "judging from its phraseology the purpose of the article in question must be to make the district attorney *show his hand as to the state's evidence*, as a matter of fairness to the accused, as well as to advise the jury

concerning the questions of fact involved [italics by this writer]." And it was held that a failure to comply with its provisions was fatal to the state's case, *citing* (as analogous) State v. Rini, 151 La. 163, 91 So. 664, and State v. Wilson, 169 La. 689, 125 So. 854.

If the purpose of the article was to make the district attorney "show his hand as to the state's evidence," and this court has said, as above, that it *"must be,"* then the sole question is whether or not a district attorney has complied with a statute obliging him to "explain * * * the evidence by which he expects to establish" the charge and "show his hand as to the state's evidence," by simply stating in his opening address "what he expects to prove," but giving no indication of the kind of evidence by which he expects to prove it.

And of course the opinions of text-writers, however eminent, and of courts, however famed, as to what a prosecuting officer may or may not, or should or should not, say in his opening address, where there is no statute obliging him to make or to refrain from making any opening address at all, can be of no assistance whatever in interpreting a statute which makes it obligatory on the prosecuting officer to make an opening address and states what that opening address shall consist of.

In our opinion the statute requires the district attorney to set forth not only *the facts* which he expects to prove, but also *the evidence*, i. e., the nature of the evidence, by which he expects to prove them, whether oral or written, or direct or circumstantial, or confessed. When the trial begins the time for skirmishing is over and the battle is on;

and the statute contemplates that the state itself shall thenceforth battle in the open and not behind ramparts; that the district attorney shall then *"show his hand as to the state's evidence*, as a matter of fairness to the accused."* And whilst we readily concede and cheerfully attest the uniform endeavor of prosecuting officers in this state, and especially of the prosecutor in charge of this case, to deal fairly with all accused alike, nevertheless we are of opinion that in this instance he has, out of excess of precaution, allowed himself to be led into error by the theories of law-writers speculating on systems of procedure which have nothing in common with that now prevailing in this state and so established by statute.

For this reason we think the confession should have been excluded.

### Decree.

For the reasons assigned the verdict and sentence herein are set aside, and the case is now remanded for a new trial.

LAND, J., concurs.

O'NIELL, C. J., and ROGERS and ODOM, JJ., concur in the result, but dissent as to the ruling that the confession was voluntary.

OVERTON and BRUNOT, JJ., dissent as to the ruling that the opening statement of the district attorney was insufficient.

O'NIELL, Chief Justice (concurring in the decree).

I concur in the prevailing opinion that, when a district attorney intends to convict a defendant by proving that he voluntarily confessed that he committed the crime charged, the district attorney should say so in his opening statement to the jury. The exact language of article 333 of the Code of Criminal Procedure, in that respect, is that the district attorney, in his opening statement to the jury, shall explain the nature of the charge and the evidence by which he expects to establish the same. That does not mean that the district attorney is required to state in detail the testimony which each and every witness for the state will give. It means that the district attorney shall outline the facts, or the nature of the facts, which he expects to prove, and on proof of which he expects the jury to conclude beyond a reasonable doubt that the defendant committed the crime charged.

But that ground for annulling the verdict and sentence is perhaps more technical than substantial, especially in this case, because the defendant knew, from the ordeal which he had been subjected to, that unless the police officers would swear that he had made a voluntary confession, the state would have no other evidence whatever to connect him with the crime which had been committed.

My opinion is that the verdict and sentence should be set aside for want of sufficient proof of a free and voluntary confession on the part of the defendant. I do not agree with the statement in the prevailing opinion that we have to decide, in this case, that either the defendant, on the one side, or the police officers, on the other side, committed perjury. It is not a lack of respect for the police officers who had the defendant under arrest, to say that their testimony is not sufficient. My objection is to the method of convicting a person on the testimony of

the arresting officers alone that he voluntarily confessed to them that he committed the crime, when he himself denies that he made a voluntary confession, and when he has been deprived of the right to have any witness to corroborate his denial. A judge or jury should never be in situation of having to decide, by judging of the veracity of a person accused of crime, against the veracity of the officers who had him under arrest, whether he voluntarily confessed to the officers that he committed the crime. The effect of that method of procedure would be to abolish trials in open court, except for the useless ceremony and solemnity of the trial in court; and it would abolish due process of law. What protection has a person on trial, if his conviction or acquittal is to depend upon whether the state can prove by the testimony of the officers who had him under arrest that he made a voluntary confession to them, at a time when and place where he had no right or opportunity to have any witness to corroborate his denial that he made the voluntary confession—except the conscience of the officers who had him under arrest?

It appears to me that the testimony of the assistant district attorney, Mr. Culligan, tends to corroborate the testimony of the defendant, to the extent that what he told the police officers was not told freely or voluntarily, but only after long hours of importunate questioning and persuasion. And, as to the testimony of the police officers who had the defendant under arrest, I say with due respect to them that, if we have to be guided entirely by their testimony, because of their good reputation and the improbability that they would use any undue influence

or persuasion to obtain a confession from a person under arrest, and if we have to disregard the testimony of the defendant, because there was no one to corroborate it, and because of his unfavorable reputation, then a person under arrest—and especially one having an unfavorable reputation—has nothing to depend upon for his constitutional guaranty that a confession shall not be used against him unless freely and voluntarily made, except the conscience of the officers having him under arrest. I concede that we must proceed upon the presumption that police officers are, like other officers of the law, conscientious men, who would not go too far in their efforts to determine whether a person under suspicion perpetrated a crime that is known to have been committed. But the writers of the Constitution of Louisiana considered it possible that officers having a person under arrest, under suspicion that he committed a crime, might subject him to treatment designed by effect upon body or mind to compel a confession of the crime; and hence they inserted in the Constitution, in section 11 of article 1, the guaranty that no person under arrest should be subjected to any treatment designed by effect upon body or mind to compel a confession of crime.

I concede that it is quite likely that the defendant exaggerated in his description of the cruelties that he was subjected to, in his desperate and hopeless struggle to have his testimony prevail over that of the police officers. But we should make allowance for the fact that it was not possible for the defendant to have a witness to corroborate his denial that he made a free and voluntary confession. And we must bear in mind that it

is not necessary that a confession should be extorted by physical punishment, to make it an involuntary confession. The fact that the defendant did not confess during the long hours when he was confined in an outlying police precinct station, instead of being in the parish prison, where he belonged, furnishes strong circumstantial evidence that he did not make a free or voluntary confession.

Besides, there is the overwhelming presumption that a man whom the police have under arrest, under suspicion of having committed a crime, is not going to take the arresting officers into his confidence, and freely and voluntarily confess to them that he committed the crime—especially when the officers have no evidence on which to convict him. And what I say now is particularly applicable to a prisoner of the character and experience that is described in the prevailing opinion rendered in this case. A man of that character—in fact, any man accused of a crime of which there is no evidence against him—who would freely and voluntarily confess to the arresting officers that he committed the crime, would be ready to go into court and plead guilty. He would not be apt to deny to everybody but the arresting officers that he committed the crime.

Aside from my objection to this method of convicting men accused of crime, my opinion is—with due respect for the police officers who testified in the case—that the defendant's denial that he made a free and voluntary confession of the crime is corroborated by the circumstances of the case, and by the strongest presumption known to the law, particularly the first law of nature.

And, above all other considerations, the burden of proof is on the state to prove that a confession was made freely and voluntarily, before it can be introduced in evidence.