152 So. 323

**STATE v. SILSBY.**

No. 32520.

Nov. 27, 1933.

Rehearing Denied Jan. 2, 1934.

Maurice R. Woulfe, James O. Brooks, and George M. Brooks, all of New Orleans, for appellant.

Gaston L. Porterie, Atty. Gen., and Eugene Stanley, Dist. Atty., and J. Bernard Cocke and M. E. Culligan, Asst. Dist. Attys., all of New Orleans, for the State.

OVERTON, Justice.

Defendant was charged jointly with three others with having robbed the Ewing Market Branch of the Canal Bank & Trust Company, in the city of New Orleans, of $11,000. In a different count, in the same bill, others were charged as accessories before the fact to the same crime. Defendant was tried alone. The case, as against the others, ei-

ther by reason of pleas of guilty, as to some, for a prior robbery of the same bank, or otherwise, as to others, has been disposed of, and therefore defendant went to trial alone. On his trial, he was convicted and sentenced to not less than nine nor more than fourteen years in the state penitentiary. This is the second sentence imposed upon defendant in this case. The first was set aside and the case remanded for a new trial. State v. Silsby, 176 La. 727, 146 So. 684. The sentence, first mentioned, is the result of the second trial. Defendant relies upon four bills of exception for a reversal.

■ The first bill of exception was taken to a question propounded to defendant on cross-examination when the foundation was being laid for the admission in evidence of an alleged confession of defendant. Defendant had testified, on his examination in chief, that the confession had been procured from him by the use of duress, and on cross-examination the state propounded to him the following question, to wit: "Now you are under four charges of bank robbery and one in Jefferson, are you not?" Defendant was also interrogated, over objection, as to other arrests and convictions. The defendant objected to the questions on the ground that they were irrelevant, for the reason that the witness was placed on the stand for the sole purpose of testing the voluntariness of his confession, which the state desired to offer against him.

Defendant had testified that the confession was involuntary. Therefore he had testified to a material fact at issue, and hence his evidence was material, and such being the case, it was proper for the state to place before the court such facts as would better enable it to determine what weight, if any, should be given the evidence of the witness. For this purpose, the state may show by questioning the accused, while he is on the witness stand, prior arrests and convictions. Code Cr. Proc. art. 495. There was no error in the ruling of the court, permitting the questions to be asked.

■■ The second bill of exception was taken to the ruling of the trial judge, holding that a confession made by defendant on the day of his arrival here from Hot Springs, Ark., at which point he was arrested, was a free and voluntary confession and holding that it should be heard by the jury.

As to whether the confession was voluntary, and was not induced by either physical or mental duress, or promises of reward or immunity, involves to some extent an inquiry into the conduct and actions of those who came in contact with the defendant from the time of his arrest to the time of the confession.

Corporal Joseph Schwem of the New Orleans police force was sent to Hot Springs, Ark., on July 10, 1931, with a capias, to arrest defendant, who was at large. On Saturday night, July 11, 1931, at 11 o'clock, Schwem, in company with several police officers of Hot Springs, arrested defendant as he was leaving a moving picture theater in company with his wife and another couple. That night, at about 2 o'clock, defendant, in the company of officers, left for New Orleans, and arrived there at 2 o'clock a. m. on Monday; the trip taking twenty-four hours steady automobile driving. On the way to

New Orleans, Schwem conversed with defendant, and asked him something about the New Orleans bank robberies, and defendant answered, according to Schwem, that anything he might have to tell would be to Chief of Detectives Grosch, whom he said he knew quite well. That seems to have ended the conversation, so far as it related to the bank robberies.

When the parties arrived at New Orleans, Corporal Schwem says that, acting under instructions to deliver the accused to the nearest police station when he reached New Orleans, he delivered him to the Ninth, although defendant says, in which he is supported by his wife, who came with him in another automobile, that he and the entire party in both automobiles arrived at detective headquarters, located in the Criminal District Court Building, from which defendant was taken to the Ninth precinct station, and there confined for the night. There is no suggestion of any improper treatment of the accused on this trip.

On the morning of July 13, 1931, this being the morning on which defendant reached New Orleans, following his arrest, Chief of Detectives Grosch, at 11 a. m., in company with Alfred Malone, captain of detectives, and Captain Daniels of the same force, went to the Ninth precinct station to interview defendant. On reaching there (though this evidence, in material parts, is contradicted by defendant), they attempted to converse with him at first through the grating of his cell, but defendant in this antiquated prison, said to be an old Spanish prison, now condemned and not used, said that he could not recognize them, and refused to converse

through the bars of his cell. They then opened the door of his cell and went in, and started again to engage in conversation with him, though this is disputed, as we shall later see, but Captain Grosch says, in which he is supported by Captain Malone and Captain Daniels, that defendant did not care to talk, but said something about seeing his attorney first.

As the officers were leaving defendant's cell, Grosch says that defendant stepped up to him and whispered, "Why did you not come alone?" but that no attention was paid by him to the remark. After these officers had reached another room in the building and when Grosch was conversing with two newspaper reporters, a doorman came up to him and Grosch says told him that defendant wished to see him. Grosch returned with the doorman to defendant's cell, and when he reached there, defendant, apparently by way of explanation for sending for Grosch, asked again, "why did he not come alone the first time?" and said that he wished to talk to him. Grosch says that he then took him into the captain's office, sat down, and told defendant what his accomplices had said. The defendant was then taken by Grosch, Malone, and Daniels to Grosch's office in the Criminal Court Building, after which Malone and Daniels departed. Defendant remained with Grosch in the office from about 1 o'clock p. m. to about 5 p. m. The office was not so closed that any one who wished might not enter, and, in fact, some did for a moment or two, including the wife of the accused, who left at the time the investigation began, apparently of her own accord, though remained mostly about the office.

Grosch began the investigation by showing to the defendant written confessions made by persons, who implicated him in bank rob-, beries in New Orleans, including the present crime. The investigation lasted from about 1 o'clock to 5 o'clock in the afternoon, and covered several bank robberies. According to Grosch's evidence and that of Culligan, the assistant district attorney, Culligan appeared at the place of the investigation at 5 o'clock. He had made his appearance there before and had left in a moment or two, namely, at 1 o'clock and at 3 o'clock, being informed that defendant was willing to talk to Grosch alone concerning the robberies. According to Culligan's evidence, as also the evidence of Grosch, defendant dictated to Culligan three confessions in as many bank robberies, including the confession in this case. After the dictations, Culligan transcribed the confessions, according to his evidence, between 5 and 6 p. m., and presented them to defendant for his signature. Defendant refused to sign them, according to Culligan's and Grosch's testimony, because he did not care to be placed in the attitude of "ratting" on those associated with him in the commission of the crimes; it appearing that the confession, at least in this instance (the others not being before us), named defendant's accomplices and coprincipals. Neither Grosch nor Culligan, according to their evidence, offered defendant any inducement, promise, or reward to confess, nor was any duress used by them, or by any one in their presence to induce a confession. The confession is to the effect that defendant was a principal in the crime and connects him fully with it; the crime itself, apart from who committed it,

having been established by officers or employees of the bank.

Malone and Daniels, the latter having died between the first and second trial, but his evidence having been preserved, saw, they said, no duress used to force a confession from defendant, and that neither they nor any one in their presence used any, or offered defendant any inducement or reward to make a confession. In fact, the record does not indicate the slightest use of force, or anything suggesting immunity or the giving of any reward, to bring about or induce a confession; but it affirmatively shows that there was not, until we reach the evidence of the defense.

Defendant took the witness stand in his own behalf. He testified that he had no sleep the Saturday night in which he was on his way by automobile to New Orleans, and up to the time he reached there the following Monday morning at 2 o'clock, and that during the rest of that night he got no sleep, due to fatigue caused by his trip and to the uncomfortable cot in his cell. He also testified that he had no water in his cell up to the time he was taken that morning to detective headquarters; that there was a bucket of water in the cell when he reached it, but that it was taken out and not replaced; and that he was given no breakfast that morning. The failure to give him water is denied positively by the doorman, and, as to breakfast, the doorman testified that, at 8 o'clock that morning, he was given the usual breakfast of a cup of coffee and a sandwich. He also said that he was not driven direct to the Ninth precinct station, as testified by Schwem, but that the entire party was tak-

en to detective headquarters, and that he was then taken to the Ninth precinct station. He further said that no effort was made to talk to him through the bars of his cell, as testified to by Grosch, but that the door to his cell was suddenly opened, and in came Grosch, Malone, and Daniels, who immediately rushed upon him, and one of them unexpectedly kicked him in the stomach, knocked him down, stomped upon him, and hit him for possibly ten, fifteen, or twenty minutes. After the officers were through beating and knocking him, he says that he crawled over to his bunk, and that Grosch, who had some statements, meaning confessions, went over to the door, where there was light, and began reading them to him and asked him what knowledge he had of them, to which defendant says he replied that he had none. Defendant says that Grosch replied by saying that the papers implicated him, and that, if he did not make a statement to correspond, it would be "too bad" for him. He also said that, after reading the papers, the three officers came back to him and resumed the kicking, stomping, and hitting, and he was questioned by the officers as to the truth of certain facts, not stated. He said that he was called all kinds of vile names, and that he answered, "Yes," to several to avoid being crippled for life, for the officers were directing their blows to a vital part of his body and had already reached it. He further said that he was not taken on Monday morning, at 11 o'clock, from the Ninth precinct station direct to detective headquarters, as testified by the officers, but instead was taken to the Seventh precinct station, where he was given another beating, and that the officers laughed and said that he had better get himself straight and tell all that he knew, otherwise it would be "too bad." Finally, according to the accused, the party reached detective headquarters, where he says the same third degree methods were resumed, and the confessions were read to him again. He states that when he was questioned, he was punched by some one, not named, on the back of the neck, kicked in the ribs, knocked off the chair, and made to sit up in the chair again, but that the moment he obeyed, he would be knocked off again, so he decided that the best thing to do would be to answer, "Yes." He says that he was questioned from 1 o'clock to 5 o'clock, and that Culligan did not ask him to sign the three confessions, but that Grosch did, and moreover that the confessions were not transcribed in his presence, as testified by Grosch and Culligan, and that he did not dictate them, but that he only answered questions Grosch asked him, and saw Culligan taking stenographic notes.

Defendant further testified that on the 16th or 17th of July, he asked a deputy sheriff to get him a doctor, and that a doctor came, examined him, told him to use an ice pack, and cautioned him against straining. The doctor remembers calling on defendant, and examining him on his complaint that he was suffering from a pain in the testes; that as well as he recalls he could locate no cause for the pain, and does not recall whether he prescribed for him or not, though probably did so. Mrs. Silsby, the wife of defendant, says that she saw her husband the day after the making of the confession, and that his face was puffed, and that he looked to her as if he could barely stand on his feet.

Section 11 of article 1 of the Constitution, this article being the Bill of Rights, reads:

"No person shall be compelled to give evidence against himself in a criminal case or in any proceeding that may subject him to criminal prosecution, except as otherwise provided in this Constitution. No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made."

The confession in this instance complies with the foregoing section of the Constitution. It was, in our view, freely and voluntarily given, after defendant had sent for and informed an officer that he was willing to talk, the record leaving no doubt that it was concerning the commission of this crime. Had he not been willing to confess, he scarcely would have sent for the officer, and caused to be communicated to him his vague message. It is most unlikely that defendant could have been treated in the manner in which he says he was and not have shown signs of such mistreatment. Culligan, the assistant district attorney, though facing him for an hour on the very afternoon of the accident, failed to observe any injury or sign thereof about him. The physician he called in recalls having observed no marks of injury about defendant, such as one would expect naturally to find after a severe beating. Our conclusion is that the beating was not received and that defendant was only malingering when he complained of the pain in his testes.

We think that it cannot be said that the confession was procured by treatment of such nature as is designed by effect on the mind to compel a confession. The questioning of defendant covered several distinct robberies, and Grosch evidently, due to their importance, wished a clear, full, and accurate statement of them. Three hours' questioning, under the circumstances, was not excessive. Defendant, we judge from the record generally, has, at least, ordinary strength of mind, and physically is not a weakling. By his own statement he was a member of the Egan Rats Gang of St. Louis—a criminal organization. Men of that type are not readily broken down mentally or physically. It is true that the offer to talk concerning these crimes came while defendant was confined in a police station, evidently for the purpose of enabling the police to ferret out the case better, when, perhaps, by the strict letter of the law, he should have been taken direct to the parish jail, instead of to a police station or jail; but, if the confession be voluntary, the place where it is made is of no consequence.

We feel satisfied from the evidence before us that the confession is voluntary. The district judge, who possessed better opportunities than we possess to determine the question, reached the same conclusion unhesitatingly. The judgment, in this respect, should be affirmed.

The third bill of exception was taken to the refusal of the district judge to admit in evidence certain photographs offered to show that other persons were beaten and bruised in an effort to force confessions from them, and to receive the evidence of those

injured. The purpose was to corroborate defendant. The crime for which the others were arrested is not the same particular crime as the one charged against defendant. A bill, involving the admissibility of this evidence, was presented and overruled, when this case was here before. State v. Silsby, 176 La. 727, 146 So. 684, 685. This court, in passing upon the bill, said:

"We think the evidence was properly excluded. Proof that the police in general habitually or constantly maltreat their prisoners, or that the particular police officers who had this defendant under arrest do so, would be admissible to corroborate defendant's testimony herein, but not proof that some other (known or unknown) officer or officers maltreated some other prisoner."

Defendant made an effort to bring his case within the foregoing rule, but has failed. The officers who it is proposed to show beat the other persons referred to, are not the same, all being different persons from those who defendant says beat him—an officer in one case, however, being a brother of an officer in the other case. The evidence was properly excluded.

The last bill of exception was taken to the overruling of a motion for a new trial. The bill presents nothing reviewable by us that we have not already considered.

The verdict and the sentence are affirmed.

O'NIELL, C. J., dissents from the ruling on bill No. 2; for the reasons given in his dissenting opinion in State v. Silsby, 176 La. 727, 146 So. 684.

ROGERS and ODOM, JJ., dissent from the ruling on bill No. 2.