237 So.2d 871

**STATE of Louisiana**

v.

**Paul J. LACOSTE.**

No. 50307.

June 29, 1970.

Milton P. Masinter, New Orleans, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., William P. Schuler, Asst. Atty. Gen., Jim Garrison, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.

HAMLIN, Justice:

Defendant appeals from his conviction of the crime of Armed Robbery, LSA–R.S.

14:64, and his sentence to serve fifty years at hard labor in the Louisiana State Penitentiary. He presents eighteen bills of exceptions for our consideration.

## BILL OF EXCEPTIONS NO. 1

(In appellant's brief it is stated that this Bill is submitted without argument.)

Bill of Exceptions No. 1 was reserved when the trial court overruled defense counsel's objection to a remark made by the Assistant District Attorney during the voir dire examination of the petit jurors.

Addressing the twelve selected petit jurors collectively, the Assistant District Attorney said:

"* * * Now, Article 24 of the Louisiana Criminal Code [1] defines those persons who may be guilty of any particular crime, and specifically in this case, it is the crime of armed robbery. Now, Article 24 defines those persons as principals * * *."

Objection was made because defendant was not charged as a principal or accessory. Counsel argued that because defendant was merely charged with armed robbery and Article 24 is a separate and distinct statute from Article 64, no mention should have been made of Article 24 without a

1. "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." LSA–R.S. 14:24.

bill of information charging its violation having been filed.

■ Defendant was jointly charged with Newt Henderson Martin with the crime of armed robbery. Martin pleaded guilty and was sentenced to serve twenty-five years at hard labor in the penitentiary. Defendant was tried separately. The Assistant District Attorney was therefore merely stating the law and making clear to the jurors that defendant was charged as a principal. Under such circumstances, no error was committed.

Bill of Exceptions No. 1 is without merit.

## BILL OF EXCEPTIONS NO. 2

(In appellant's brief it is stated that this Bill is submitted without argument.)

Bill of Exceptions No. 2 was reserved when the trial judge sustained the State's objection to defense counsel's informing a prospective juror as to the penalty assessed for armed robbery.[2]

This bill was reserved under the circumstances that during the course of the voir dire examination, one prospective juror volunteered that he could not give the State a fair trial because he felt that the penalty for armed robbery was too severe. Defense counsel later attempted to inform

2. " * * *
"B. Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than five years

another prospective juror of the possible penalty in this case. The State objected because it had not opened the door for questioning as to penalty in its challenges, and because the expression from the prior prospective juror was merely a voluntary statement.

■■ We find that defendant suffered no prejudice from the trial judge's ruling. The real function of the jury is to determine the guilt or innocence of the accused; it must decide whether or not the State proved all the essential elements of the crime charged beyond a reasonable doubt. "A sentence is the penalty imposed by the court on a defendant upon a plea of guilty, upon a verdict of guilty, or upon a judgment of guilty." LSA–C.Cr.P. Art. 871.

Bill of Exceptions No. 2 is without merit.

## BILL OF EXCEPTIONS NO. 3

(In appellant's brief it is stated that this Bill is submitted without argument.)

Bill of Exceptions No. 3 was reserved when the trial judge overruled defendant's motion for a mistrial.

After the jury panel was completed, the jury duly sworn, and the State ready to proceed, the trial judge directed the Minute Clerk to read the bill of information.

and for not more than ninety-nine years, without benefit of parole, probation or suspension of sentence." LSA–R.S. 14:64.

The bill charged both Paul J. Lacoste and Newt Henderson Martin as defendants, and the names of both were read as defendants. Defense counsel moved for a mistrial, stating:

"Now, if it please the Court, I would like to move for a mistrial on the grounds that the name of a defendant or a person was read out, who is not present in Court and is not on trial today, has nothing to do with this case as far as being the accused. That is the name of Newt Martin."

█ The trial judge overruled the motion for a mistrial. His reasons, which we find correct, are stated in the following per curiam:

" * * *

"Martin had previously pleaded guilty, and he was called as a witness in this case and he testified that he was involved in the armed robbery, and refused to answer the question when asked if the defendant, Paul Lacoste, was with him. He was later cited for contempt of court for this act.

"Article 765 of the Code of Criminal Procedure requires that the bill of indictment or information be read to the jury immediately after the selection and swearing of the jury. This was done. The bill of information was read exactly as it was written when same was filed."

Bill of Exceptions No. 3 is without merit.

## BILL OF EXCEPTIONS NO. 4

(In appellant's brief it is stated that this Bill is submitted without argument.)

Bill of Exceptions No. 4 was reserved when the trial judge overruled defense counsel's objection to the consistent referral to Newt Martin and Kenny Roberts in the opening statement of the Assistant District Attorney.

The armed robbery was that of the National Bank of Commerce, 3201 South Carrollton Ave., New Orleans, La., on July 27, 1967, at approximately 1:50 P. M. In his opening statement, the Assistant District Attorney said that the State would prove that Paul J. Lacoste and Newt Martin entered the bank about ten minutes before closing time, and that thereafter Lacoste pointed a shotgun at patrons and employees, telling them it was a hold-up, while Newt Martin went behind the tellers' windows and removed currency; that Newt Martin was covered with a sheer stocking type of mask over his head, through which part of him could be seen, and that Paul Lacoste was covered in a darker, heavier type of black mask, sunglasses being over part of his eyes, which for the most part concealed his face; that Paul Lacoste, upon leaving the bank with Newt Martin, drove his car around the block, proceeded down the street, and then

threw the money to Ken Roberts, who was waiting at a certain place for that purpose.

Article 766 of the Code of Criminal Procedure provides that the opening statement of the State shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the State expects to prove the charge.

Herein, the Assistant District Attorney in his opening statement was describing the parts allegedly played by Kenny Roberts (charged in a separate bill of information at a later date), Paul J. Lacoste, and Newt Martin in the commission of the armed robbery. He was reciting what he intended to prove during trial. All of this formed a part of the res gestae. LSA-R. S. 15:447-448.

■ We do not find that the Assistant District Attorney's remarks were improper, nor do we find that defendant was prejudiced by said references. In his per curiam to this bill, the trial judge states that the State proved all of the allegations set out in the opening statement beyond a reasonable doubt. Under such circumstances, we find that defense counsel's objection was properly overruled.

Bill of Exceptions No. 4 is without merit.

## BILLS OF EXCEPTIONS NOS. 5 AND 6

(These bills were not argued.)

Bill of Exceptions No. 5 was reserved when the trial judge overruled defense counsel's objection to the introduction of surveillance film alleged to be that of the robbery.

Bill of Exceptions No. 6 was reserved when the trial judge overruled defense counsel's objection to the introduction in evidence of S-7 and S-8, surveillance film of the robbery, which was in the possession of the State at the time of its introduction.

Herein, counsel for the defendant argues in brief:

"Bill of Exception Number VI, was taken on the same subject matter as Bill of Exception Number V, being based upon the State's inability through competent witnesses to lay a proper foundation for the introduction of the film and its use in Court for the benefit of the witnesses and the jury. The defense attorney objected to its introduction and use because the State failed to show where the film was obtained, how it was obtained, who processed it and where it was taken. Furthermore, no one could testify that this was the actual filming of the bank robbery of the National Bank of Commerce Bank on July 27th, 1967, as no witnesses were produced that had any direct knowledge concerning this film. There was no date on the film or its container showing when or where the film was taken or what it depicted. Furthermore, no predicate or

foundation was established for the introduction and use of this film."

■ We find, as did the trial judge, that Bill of Exceptions No. 5 was prematurely reserved. It was taken outside of the presence of the jury and before the State had commenced showing the film and questioning its witness Steve J. Mortillaro, a bank customer and a witness to the robbery. Defendant suffered no prejudice from the trial judge's ruling.

In his Per Curiam to Bill of Exceptions No. 6, the trial judge sets forth the reasons for his conclusions and explains the incidents connected with the subject matter of this bill as follows:

"This bill was reserved when the Court overruled the defendant's objection to the admission of the motion picture films of the bank robbery as it was in progress. The State showed that the motion picture films were taken from two surveillance cameras which were located in the bank, which was robbed. The evidence showed that the films were removed immediately after the robbery by the F.B.I. Agent, and taken to the Dubl-Check processing lab where it was processed. This testimony was elicited from Special Agent Norman E. Zigrossi of the F.B.I., who further testified that he, other agents and members of the New Orleans Police Department viewed the films that date, and he entered it as

evidence in the case after initialing and logging same, and it was maintained as evidence in the F.B.I. vault exhibit room until the morning of trial when he brought it from that vault and handed it to Assistant District Attorney Julian Murray in open court.

"Prior to the witness, Steve Mortillaro viewing the films, he had given an oral description of what had happened. After viewing the films, he stated that the films accurately portrayed the events as they occurred. All of the bank tellers testified as to the events which occurred, and corroborated the testimony of Steve Mortillaro. The films were again shown to another witness, Mrs. Rita Fisher, who testified that the films accurately portrayed the events as they occurred. This Court was satisfied beyond a reasonable doubt that the films accurately portrayed events as they occurred, and a proper foundation had been laid by the State. Defense's objection went to the weight of the evidence and not its admissibility. * * *"

"The principle of admitting photographic evidence is but a corollary to that permitting the introduction of the physical object itself. As a general rule, this court has recognized that photographs are admissible in evidence when they are shown to have been accurately taken, to be a correct representation of the subject in controversy, and where they tend to shed light upon the

transaction before the Court. State v. Johnson, 198 La. 195, 3 So.2d 556 (1941). * * *" State v. Giles, 253 La. 533, 218 So.2d 585, 588 (1969). "It is the well settled rule that a picture to be introduced in evidence need not be verified by the photographer who took the picture, and that the sufficiency of the verification is a matter largely within the discretion of the trial judge. * * *" State v. Fox, 251 La. 464, 205 So.2d 42, 43, 44 (1967).

■■ We find that the film was relevant to the material issue of this prosecution, LSA–R.S. 15:435; it was therefore admissible in evidence, and it was for the jury to decide whether it bore upon the guilt or innocence of the defendant. State v. Crayton, 255 La. 375, 231 So.2d 357. We do not find that defendant's constitutional rights were violated by the introduction in evidence of S–7 and S–8. The trial judge is allowed to exercise discretion in a matter such as this; we do not find that he abused it. State v. Johnson, 198 La. 195, 3 So.2d 556; State v. Giles, 253 La. 533, 218 So.2d 585; State v. Fulghum, 242 La. 767, 138 So.2d 569.

Bills of Exceptions Nos. 5 and 6 are without merit

## BILL OF EXCEPTIONS NO. 7

Bill of Exceptions No. 7 was reserved when the trial judge overruled defense counsel's objection to his order to the defendant to utter the words "hurry up"

three times in about the same tone as they had been uttered by the witness Steve J. Mortillaro.

Steve J. Mortillaro, a student, testified that he was making a deposit in his savings account in the bank at the time this robbery was committed. He testified, in part:

"Q. Approximately at what voice level, or degree of volume was the defendant speaking, and if you will, when you answer this question, answer about in the volume in which the defendant was speaking.

"A. Well, he was shouting almost frantically in a very hurried type way, similar to 'Hurry up, hurry up'. Similar to that.

"Q. About that?

"A. Right, probably a little bit louder, a little bit louder than that actually, but it was * * *

"Q. Well, I'm asking you, if you will, don't worry about how much noise you make. If you will, say in the same volume that you remember him saying it at the time he was doing it.

"A. Okay. He was walking around. He said, 'hurry up, hurry up', about similar to that.

"Q. About that volume, is that correct?

"A. Yes."

The Assistant District Attorney in his opening statement said:

"Now, during the course of the armed robbery, the defendant before the Bar, Paul Lacoste, repeatedly called to his co-defendant, Newt Martin, the co-defendant in the commission of the crime, telling him to hurry up, hurry up. And at certain times, he told some of the employees in the bank, to move. He said this on repeated occasions, which was heard by the persons who were in the bank. After receiving some of the money which was in the bank, that is, over thirteen thousand dollars worth, both of the defendants fled the scene."

Mortillaro's testimony, supra, was therefore offered as proof of the foregoing statement of the Assistant District Attorney.

After Mortillaro had given the testimony, supra, the Assistant District Attorney made the following request:

"Your Honor, for the purpose of iden-. tification, the State would request that the Court instruct the defendant to say those words in approximately the same volume which the witness said, for the purpose of seeing if the witness can identify the voice of the defendant."

There was objection by defense counsel, and the State replied:

"Your Honor, so that the record would be perfectly clear, the State, of course, is not asking this person to testify to anything, or to taking the stand. We merely want to be able to have this witness have the opportunity to see if he can identify the voice. It is for identification only. A person's physical makeup includes his voice. And, for identification only, is the reason the State is asking it to be done. It would not ask this man to testify."

After objection by defense counsel, the trial judge instructed the jury as follows:

"The Court overrules the objection of counsel for the Defense, and instructs the Jury that I am now going to order the defendant to utter those words in about the same tone of voice that the witness did *for the purposes of identification only*. This does not mean to insinuate that this defendant uttered those words. He is not being made to utter the words in a testimonial manner. He is being made to utter them for the *purposes of identifying his voice*. Now, I want that plainly understood, gentlemen of the Jury." (Emphasis ours.)

The trial court ordered the defendant to utter the words "hurry up" three times; his utterances were made in obedience to the instruction of the court. For determination here is the correctness vel non of the trial judge's order to make the utterances.

In this Court defense counsel contends:

"The trial Court's order for this defendant to utter these words allegedly said by the robber during the commission of the robbery was prejudicial and in effect deprived the defendant of his right not to testify. The burden of proving the defendant's guilt is upon the State and the State cannot use the defendant in its proof. This order of the trial judge placed the defendant in a position of involuntarily taking the witness stand and exposed him to the jury for failure to take the witness stand in the event he had chosen to remain silent. The trial court's order and ruling denied the defendant of a basic Constitutional guarantee. The courts explanation that the uttering of these words were merely for the purpose of voice identification is unexceptable. The conditions under which the robber spoke, a hood over his head, in a larger room and while presumably highly excited and charged with emotion, could not possibly be duplicated by the defendant speaking in a normal manner, unhooded, in a small court room."

This contention in substance avers that defendant was made to incriminate himself contrary to the Fifth Amendment to the Constitution of the United States and Art. I, Sec. 11, La.Const. of 1921.

In Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the United States Supreme Court held that evidence of an analysis of the petitioner's blood taken over his objection by a physician while he was in a hospital, after being arrested for the offense of driving an automobile while under the influence of intoxicating liquor, was not inadmissible on the ground that it violated the Fifth Amendment privilege against self-incrimination. The Court also held that the taking of blood did not violate petitioner's right under the Fourth Amendment to be free of unreasonable searches and seizures. The United States Supreme Court said:

"It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of

'real or physical evidence' does not violate it." 86 S.Ct., at p. 1832.

In 1967, in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, the United States Supreme Court said:

"We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have. It is no different from compelling Schmerber to provide a blood sample or Holt to wear the blouse, and, as in those instances, is not within the cover of the privilege. Similarly, compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a 'testimonial' nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt. * * *" 87 S. Ct., at p. 1930.

In 1952, in State v. Roy, 220 La. 1017, 58 So.2d 323, this Court, after a thorough review of the jurisprudence, held that compelling a defendant to have her height measured before the jury did not violate her constitutional protection under Art. I, Sec. 11, La.Const. of 1921. See, also, State v. Robinson, 221 La. 19, 58 So.2d 408.

■ Under the above jurisprudence, we find that the trial judge committed no error in giving the instructions supra. His order to the defendant to utter the words "hurry up" were for the purpose of voice identification by the witness Mortillaro. The words were not of a testimonial nature; they had no testimonial significance. The entire subject matter of this bill went to the jury for its consideration. The utterance and identification made therefrom were admissible evidence to be weighed by the jury in determining the guilt or innocence of the accused.

Bill of Exceptions No. 7 is without merit.

## BILL OF EXCEPTIONS NO. 8

(In appellant's brief it is stated that this Bill is submitted without argument.)

Bill of Exceptions No. 8 was reserved when the trial court overruled defense counsel's objection to a question propounded to the State's witness Mrs. Henry E. Newfield, Jr.

Mrs. Newfield, Assistant Manager of the Carrollton Branch of the National Bank of Commerce, testified that the tellers had marked money in their currency drawers. She said that "bait money" was accessible to a robber. She was then asked, "Would there be any way for him, without knowing the system, to know that it is bait money?"

 Counsel for the defendant contended that the question supra called for a conclusion on the part of the witness, and that she was not qualified to give it. The witness did not answer the question. It was reframed by the Assistant District Attorney and not objected to. Defendant suffered no prejudice.

Bill of Exceptions No. 8 is without merit.

## BILL OF EXCEPTIONS NO. 9

Bill of Exceptions No. 9 was reserved when the trial judge overruled defense counsel's motion to exclude from evidence an alleged inculpatory statement given by the defendant prior to trial and the notice given to defense counsel during trial that such a statement had been made by the defendant.

The prosecution of this case was divided between Julian R. Murray, Jr. and David Perlis, Assistant District Attorneys. They had in their possession a written notice of intention to use an inculpatory statement made by the defendant to be delivered to his counsel. Each thought that the other would deliver the notice, and it was not delivered until after trial had commenced and a number of witnesses had testified.

On January 19, 1968, Murray took the stand and, while the jury was outside of the courtroom, testified, in part:

"* * * During the course of the trial, late into the trial, before we recessed for dinner yesterday, Mr. Perlis in going through the file to look up certain information in the police report, ran across the written notice of intention. Called that to my attention, the fact that we had not given it to Mr. Masinter [defense counsel] prior to reading the opening statement. We recessed for dinner [the night previous], and after having come back from dinner before calling any of the police officers, the written notice of intention was given to Mr. Masinter. But, of course, after the trial had already started, and after the opening statement had been read.

"This note of evidence is being given because the State wants to establish that our written notice of intention was left out inadvertently, was not given to Mr. Masinter inadvertently and in good faith. We at no time, or for any reason ever held it back by trying to take advantage of Mr. Masinter. I would like to point out in addition to this, that at the time, after having given this notice to Mr. Masinter, we realized that we were late. That at the time we called the police officers, we did not go into any questions about whether or not a statement had been made because we thought it would be proper not to say that until we had a chance to recess to give Mr. Masinter a

chance to make his argument, which we felt sure he would want to make against the admission of this statement.

"* * *

"As the Court knows, we requested, but after having given this to Mr. Masinter, that we did recess rather than continue with the case so that Mr. Masinter would have that evening and any necessary time of the following morning before trial began in which he could prepare for this, to defirm this notice of intention which we had given to him.

"* * * for the purpose of this note of evidence, this is all I wanted to put in to show that we were in good faith, and that this was left out inadvertently. The State believes under the provisions of the Code, that the Court in its discretion can still allow these statements to be introduced."

Defense counsel objected to the admission of the statement in evidence on the ground that its admission would be a violation of Article 768 of the Code of Criminal Procedure, which recites:

"If the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence."

Defense counsel stated that he did not question Mr. Murray's good faith; he said Mr. Murray was under oath and that he believed him.

In this Court defense counsel submits that he is not concerned with what the statement was, confession or inculpatory statement, but rather he is concerned with the fact that the State did not adhere to the statute. He argues that the trial court incorrectly and prejudicially allowed the statement to be introduced in evidence in spite of the clear and concise wording of Article 768, supra.[3]

Article 921 of the Code of Criminal Procedure sets forth the grounds for reversal of judgments of the trial court. It states, "A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an

---

3. Article 767 of the Code of Criminal Procedure provides, "The state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant." The Official Revisions Comments under Article 769(c) (2) recite: "Arts. 767 and 768 are an entirely new approach to the problem of reference to a confession in an opening statement. The defendant cannot properly prepare to meet the issue unless he is apprised that the state intends to use the confession. However, there can be no doubt that any mention of a confession to the jury has some prejudicial effect. Arts. 767 and 768 solve both problems by requiring that the defendant be advised of the state's intention and by prohibiting any reference to a confession before a jury until it is actually introduced."

examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right."

■ We believe that the underlying purpose of Article 768, supra, is to avoid surprise and allow adequate time for the preparation of defense, and, perhaps, the filing of preliminary motions. The article is statutory law. However, when it is not followed to the letter, as happened in this case, this Court will examine the entire record and determine whether the defendant was prejudiced by the non-compliance, and whether he suffered a substantial violation of his statutory rights. LSA–C.Cr. P. Art. 921, supra.

The record discloses that the instant inculpatory statement was in the hands of defense counsel for approximately twelve hours before it was contested—the trial court recessed at 9:22 P.M. and reconvened at 10:00 A.M. the following morning. Counsel did not ask for a continuance; he merely stood on what he contended were the absolute and inflexible provisions of Article 768. The record does not reveal that defendant suffered any prejudice from the late notice given to his counsel, who admitted the good faith of the State. As will be shown later in this opinion, the inculpatory statement was voluntarily given, and defendant received all warnings required by law and the jurisprudence. Cf. State v. Rodgers, 251 La. 953, 207 So.2d 755.

■ The circumstances connected with the reservation of this bill of exceptions and the mandate given to us under Article 921, supra, constrain us to find that the trial judge did not abuse his discretion in overruling the motion filed by defense counsel. We also find that defendant did not suffer a deprivation of his constitutional rights.

Bill of Exceptions No. 9 is without merit.

. BILL OF EXCEPTIONS NO. 10

(In appellant's brief it is stated that this Bill is submitted without argument.)

Bill of Exceptions No. 10 was reserved when the trial judge outside of the presence of the jury ruled that the defendant's statement was given voluntarily.[4]

■ Having read the testimony of record in its entirety, we find that the trial

---

4. Captain James Kruebbe of the Police Department testified with respect to the inculpatory statement, relating its contents as follows:

"Q. Now, the statements that were made, tell the Court and the Jury basically, chronologically what took place and what was said.

"A. Mr. Lacoste, in my presence asked, 'How much time will I get for this?' We were discussing the bank robbery.

judge's ruling was correct. The following per curiam correctly states the facts connected with the reservation of this bill:

"Q. And, what did you say in response to that?

"A. That, the time that he gets for a bank robbery, or any offense is determined by the courts, and not the police.

"Q. Now, was there any further conversation with him relative to the bank robbery?

"A. Yes sir. Mr. Lacoste wanted to confer with another person.

"Q. Did he say for what reason he wanted to confer with the other person?

"A. The disposition of the money. We were looking for the money from the bank robbery.

"Q. Had you asked him for the money?

"A. Yes sir, I had asked him for the money. During the course of the interrogation, I informed him of the events of the armed robbery, of prior knowledge that the Department had, I mean, the Detective Bureau had, of the arrest of another party, that we were seeking still a third party, and that we were trying to recover the money from the bank robbery.

"Q. And did you ask him for the money?

"A. Yes, sir, I did.

"Q. Is that when he asked to speak to Newt Martin?

"A. Yes sir, he said he wanted to confer with someone else before he would tell us.

"Q. Did he say who the someone else was?

"A. Yes sir, he did.

"Q. Who was it?

"A. Newt Martin.

"Q. Was he there in the Detective Office, or anywhere nearby?

"A. He was in the Detective Bureau, yes sir. He was in another office. He was over in the larger office.

"The State laid a predicate, outside the presence of the jury, for the purpose of introducing an alleged inculpatory

"Q. Now, was he allowed to speak to Newt Martin?

"A. Yes sir.

[Colloquy.]

"Q. Continue, Capt. Kruebbe. What took place then?

"A. I asked Mr. Lacoste what about —do we get the money. Where is the money. And, after his conference, he came back and told me that, 'I'll take my chances'.

"Q. After his conference with whom?

"A. With Newt Martin.

"Q. Now, did he request to speak with Newt Martin? Did you send him there, or what?

"A. Yes sir, he went * * *

[Colloquy.]

"Q. When you told him that you wanted to get the money back, and asked him where the money was, what did he say?

"A. He told me that he would take his chances.

"Q. Is that what he said immediately?

"A. There are two phases to this. The first phase of the statement of Mr. Lacoste in my presence was, that he asked how much time will I get for this. And, in response to his question, I told him, that we had nothing to do with it, that was a matter for a judge and a jury. I also told Mr. Lacoste, that—during my conversation with Mr. Lacoste, I told him, that we had made an apprehension. That we had Martin, that we had him, but that we were looking for the third party, and we wanted the money. He didn't believe it. He wanted to see Martin, so I arranged for him to see Martin. He conferred with Martin, and he came back, and I said, what about it, Mickey, what about the money. He said, 'I'll just take my chances'.

"Q. The person that you are referring to as Mickey * * *

"A. Mr. Lacoste."

statement made by the defendant. The State offered as witnesses a police captain, two detectives and an F.B.I. Agent, all of whom were present when the defendant was interrogated. The evidence established that the defendant was read the Rights of Arrestee Form, but that he refused to sign same because he did not believe in signing anything. He did tell the officers that he was glad to answer their questions because he was not involved. The interrogation lasted approximately 40 minutes, and then he was permitted to confer privately with a co-defendant Newt Martin. After his conference he told the police officers that he would, 'take his chances'. This whole questioning period and conference with the co-defendant took approximately one hour.

"When the State rested on the predicate, the defendant offered no evidence at all. The Court was convinced beyond a reasonable doubt that the alleged statements made by the defendant were free and voluntary, and ruled as follows:

" 'The Court finds that there is absolutely no evidence to the effect that this defendant was interrogated around the clock by teams of detectives. The Court finds that there is absolutely no evidence that this defendant was forced to make a statement as alleged by counsel. There is absolutely no evidence in this record to

indicate that any promises of immunity or reward were made to this defendant. There is absolutely no evidence in this record that any threats were made against this defendant. Consequently, the Court holds that the statement whatever it is, was a free and voluntary one. The evidence is overwhelming to the effect that the defendant would not sign the Right of an Arrestee Form, but did express his willingness to the police and the F.B.I. to discuss the matter.'

" * * *

"The question of the admissibility of a confession is for the judge, while its effect is for the jury, and whether sufficient basis has been laid for the admissibility of an alleged voluntary confession is a question of fact upon which ruling the trial judge will not be disturbed unless clearly against the preponderance of the evidence. See State v. Walker, 229 La. 229, 85 So.2d 497, and State v. Simpson, 247 La. 883, 175 So.2d 255." See, also, State v. Fulghum, 242 La. 767, 138 So.2d 569. Cf. State v. Anderson, 254 La. 1107, 229 So.2d 329.

Bill of Exceptions No. 10 is without merit.

BILL OF EXCEPTIONS NO. 11

(In brief counsel for appellant likens this Bill to Bill No. 9.)

Bill of Exceptions No. 11 was reserved when the trial judge overruled defense counsel's motion to call Officers James Miller and Norman E. Zigrossi to the stand.

Detective Eugene Fields testified in the presence of the jury that while in his presence defendant was not intimidated, hit, kicked, held, pushed, or in any other manner physically abused for the purpose of eliciting statements from him. This testimony was given just prior to the testimony of Captain James Kruebbe with respect to the inculpatory statement, supra.

· After Detective Fields testified, defense counsel requested that Officers Miller and Zigrossi be called for the reason that they were present when various statements were allegedly made by the defendant. The trial court overruled the motion of counsel for the calling of these officers and ruled that the statement made by defendant was a free and voluntary one and could be used in evidence. Our interpretation of his ruling, as set forth in his per curiam, is that the evidence of the officers would have been cumulative.

■ The trial court had previously ruled (before the above ruling) on the voluntary nature of the inculpatory statement. It had heard Officers Miller and Zigrossi testify as to the conditions under which the statement was given and then ruled that the inculpatory statement was given voluntarily. We do not find that the instant ruling prejudiced the defendant. The testimony sought to be elicited would not have been relevant to the jury's determination. "Whether confessions are voluntarily made or not is question of law to be determined by court as condition precedent to admission, but having been declared competent and admissible they are before jury for consideration and jury has no authority to reject them as incompetent." State v. Simpson, 247 La. 883, 175 So.2d 255. The inculpatory statement itself was the evidence to be considered by the jury in determining the guilt or innocence of the accused.

The case of State v. Honeycutt, 216 La. 610, 44 So.2d 313, is not apposite. Therein, when the trial court was determining whether or not the defendant's confession was voluntarily given, the defendant testified that he was mistreated. The testimony of the officers present at the time of the alleged mistreatment was necessary to rebut or affirm the defendant's testimony.

Bill of Exceptions No. 11 is without merit.

## BILL OF EXCEPTIONS NO. 12

(In appellant's brief it is stated that this Bill is submitted without argument.)

■ Bill of Exceptions No. 12 was reserved when the trial judge overruled defense counsel's objection to the State's offering in evidence S–9, "bait money."

The contentions of the defendant, which we find to be without merit, have been correctly answered by the trial judge in the following per curiam:

"The State offered and filed into evidence a 'bait money' list and a group of twenty dollar bills which bore the serial numbers which were on the bait money list. The defendant objected on the ground that the State did not show that the bank tellers received this list on the day of the robbery, and that same was not initialed by the bank tellers but was initialed by the assistant manager, Mrs. Newfield, on July 28, 1967, the date of the robbery, when she handed the list to the police officers.

"Through testimony it was established that the bank had a group of bills which they called bait money. The serial numbers of these bills were written down, and a list of these numbers was kept by the manager and assistant manager of the bank so that in the event of a robbery, and in the event that the money was recovered, it could be identified by the serial numbers. The State through witnesses showed every step which was taken in retrieving the money, and that the numbers on the bait money bills corresponded to the numbers on the list furnished the authorities by Mrs. Newfield. In the presence of the jury random bills were taken from this bait money pack and compared with the numbers on the list, and they corresponded. Every link in the chain of evidence was established beyond a reasonable doubt, and the introduction of the list of serial numbers and the bait money was relevant to the issue."

Bill of Exceptions No. 12 is without merit.

## BILL OF EXCEPTIONS NO. 13

Bill of Exceptions No. 13 was reserved when the trial judge overruled defense counsel's motion to strike the line-up which occurred herein and any reference to the line-up in this entire trial.

A line-up was conducted in the show-up room of the Central Lock-up by Sgt. Lawrence Vigurie of the New Orleans Police Department at approximately 8:15 P. M. on July 27, 1967, the day the instant crime was committed. Defendant, No. 2, and Newt Martin, No. 4, appeared in the line-up with five other persons. Each person was asked to repeat the words "hurry up" several times. Defendant was identified by a number of witnesses as the bank robber who had held the shotgun in the robbery. These witnesses were employees of the National Bank of Commerce and customers who were in the bank at the time of the robbery. The identification of the defendant was a voice identification. These persons appeared as State witnesses and testified at the beginning of trial as to their identification of the defendant.

Sgt. Vigurie testified as a defense witness after the State had rested. He described the line-up, supra, and the physical arrangements of the show-up room. Court recessed during the middle of his testimony for the purpose of viewing the show-up room. When trial was reconvened, Sgt. Vigurie testified that prior to the line-up the defendant was advised of his right to have an attorney present at the line-up and was asked if he wanted an attorney; that defendant had responded that he did not have an attorney; that he was asked if he wanted to use the phone. Defendant did not secure the services of an attorney. Sgt. Vigurie said that he called Al Oser, an Assistant District Attorney, to come over to Central Lock-up and apprise the defendant and the other persons who were to appear in the line-up of their rights. Sgt. Vigurie's testimony is as follows:

"Q. Sgt. Vigurie, on the 27th of July, 1967, is that the date that Paul Lacoste was in the line-up?

"A. Yes.

"Q. Do you know the approximate time?

"A. Approximately 8:20, 8:15.

"Q. At that time, did you or anyone in your presence ask him if he wanted an attorney present at that line-up, or advise him of his right to have an attorney present at that line-up?

"A. Yes.

"Q. Who did that?

"A. Myself, and they said they didn't have an attorney. We got Mr. Al Oser, from the District Attorney's Office, to come over to the show-up and advise them.

"Q. They did not have an attorney to represent them?

"A. They said they did not have an attorney, no. I asked them if they wanted to use the phone. If they wanted to call an attorney.

"Q. Did you offer to supply them with an attorney?

"A. I had none at that time, I have none now. This was at 8 something at night. I had no attorney around here.

"Q. Is Mr. Al Oser an attorney?

"A. He's with the District Attorney's Office.

"Q. In other words, he's a prosecutor.

"A. Yes."

After the above testimony of Sgt. Vigurie, including testimony concerning the line-up, defense counsel made the following motion which was overruled by the trial court.

"* * * I would like to ask the Court to strike the line-up and any reference to the line-up in this entire trial

since of that date July 27, 1967. The defendant was without benefit of counsel, and under the Wade decision, starting with the 12th day of June, 1967, that every line-up, the accused must have an attorney present at the line-up for the line-up to be valid, and admissible into evidence. And, he did not have an attorney, he was not offered an attorney, but a prosecutor was there, not to represent him, but to represent the police and/or the State."

The same argument as was made in the above motion is submitted to this Court. Counsel relies on the case of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

▬ Article 65 of the Code of Criminal Procedure provides that it is unlawful for the District Attorney or Assistant District Attorney to defend or assist in the defense of any person charged with an offense in any parish of the State. Herein, Article 65 was not followed; but, the defendant has not shown that Mr. Oser did not apprise him of his rights nor has he shown that Mr. Oser did not properly advise or represent him at the line-up. He has not shown that he was prejudiced by any advice that Mr. Oser might have given him. Sgt. Vigurie's testimony was elicited at the end of trial, and Mr. Oser was not called as a witness. The instant motion was filed after defense counsel had not offered prior objection to the identification of the defendant by a number of State witnesses. In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 1937, 18 L.Ed.2d 1149, the United States Supreme Court said that "there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid [of counsel] * * * as at the trial itself.'" However, at p. 1938 the Court said, "Moreover, we leave open the question whether the presence of substitute counsel might not suffice where notification and presence of the suspect's own counsel would result in prejudicial delay." Therefore, under the facts and circumstances connected with the reservation of the instant bill, we are constrained to find that defendant was not deprived of his constitutional right to have counsel at the line-up, and that Mr. Oser served as substitute counsel.

The trial judge in his per curiam to this bill states that the testimony of record establishes that all of the defendant's rights were protected at the line-up. We have read the testimony and agree with this finding.

The testimony discloses that there was one in-court identification. While the State's witness Steve Mortillaro was testifying, defendant was asked to say the words "hurry up" a number of times. See Bill of Exceptions No. 7, supra. After the defendant repeated the words, Mortillaro gave the following testimony:

"Q. At this time, Mr. Mortillaro, I ask you, if you can identify the voice that you just heard speak in the courtroom today, speaking the words, 'hurry up'?

"A. To my recollection, that's quite similar to the voice I did hear in the bank at the time. I would say that, bringing them together, that was the voice.

"Q. Now, you base this identification on what you heard at the bank, not on what you heard at the time of the line-up, is that correct?

"A. I'm using as a basis, what I heard in the bank."

See, State v. Pratt, 255 La. 919, 233 So. 2d 883.

The jury was able to weigh the above testimony of Mr. Mortillaro, as well as that of the other witnesses who were at the line-up.

We do not find that the trial judge abused his discretion in overruling defendant's motion to strike the line-up. Under Article 921 of the Code of Criminal Procedure, supra, we do not find that defendant has suffered a substantial violation of a statutory right.

Bill of Exceptions No. 13 is without merit.

## BILLS OF EXCEPTIONS NOS. 14, 15, 16 AND 17

(In appellant's brief it is stated that these Bills are submitted without argument.)

Bills of Exceptions Nos. 14, 15, 16 and 17 were reserved when the trial court overruled defense counsel's objections to the State's rebuttal argument.

The Assistant District Attorney made the following statements in his rebuttal argument:

"* * * Now, we have to prove, gentlemen, beyond a reasonable doubt, that armed robbery, number one, was committed, and number two, it was committed by the defendant at the bar, or at least, he was a principal in the commission of the armed robbery. Now, we will have to prove this beyond a possibility of a doubt or beyond a shadow of a doubt * * *"

"* * * And, while armed with a dangerous weapon. You saw the weapon, a sawed off shotgun. One of the most dangerous weapons that exist. Was an armed robbery committed? Element one, I think we can say without a doubt. Mrs. Zetzman, for example said, check for the money * * *"

"* * * But, what facts do we know. We know that Ferdinand got the money

from Kenny Roberts. We know that Newt Martin said * * *"

"* * * His Rights of Arrestee's Form and Rights of Arrestees advised to him once in the car, once by the police officer, once by the FBI man. He knew his rights by the time he was finished. He knew his rights, he didn't mind talking about it, but he wasn't going to sign anything. He doesn't have to sign anything. If he had to sign something, his Honor wouldn't have admitted it into * * *"

Article 774 of the Code of Criminal Procedure provides that the State's rebuttal argument shall be confined to answering the argument of the defendant.

The argument of defense counsel to the jury was in great part to the effect that the state had failed to prove its case against the defendant because the State's whole case boiled down to one thing—a voice identification.

We do not find that the trial judge abused his discretion in overruling defense counsel's objections to the rebuttal argument of the State. The Assistant District Attorney reviewed a great part of the evidence of record, but this was done in the form of summary. It was done for the purpose of rebutting the theory of the defense. Defendant suffered no prejudice by the above statements.

Bills of Exceptions Nos. 14, 15, 16 and 17 are without merit.

### BILL OF EXCEPTIONS NO. 18

Bill of Exceptions No. 18 was reserved when the trial court overruled defense counsel's motion for a new trial.

This bill presents nothing new for our consideration. All matters urged have been covered in the bills of exceptions supra.

Bill of Exceptions No. 18 is without merit.

For the reasons assigned, the conviction and sentence are affirmed.

McCALEB, J., concurs in the decree.

BARHAM, J., dissented.

SANDERS, Justice (dissenting).

Bill of Exceptions No. 9 raises a serious question concerning the admission into evidence of defendant's inculpatory statement.

Article 768 of the Louisiana Code of Criminal Procedure provides:

"If the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence."

The Article is explicit. To make an inculpatory statement admissible at the trial, the State is required to give written notice to the defendant before its opening statement. See State v. Rodgers, 251 La. 953, 207 So.2d 755.

In the present case, the State gave no written notice to the defendant before its opening statement. The reason for the omission need not be explored. We can accept the State's testimony that it was an oversight. During the course of the trial, after several witnesses had been examined, the State was permitted to then give written notice and introduce the inculpatory statement.

The majority holds that the trial judge is vested with discretion as to the admission of the inculpatory statement and properly admitted it. Alternatively, the majority holds that, if the statement were improperly admitted, it was not reversible error, because the defendant suffered no loss of "constitutional rights." I disagree.

As is evident from the use of the word *shall*, Article 768 is mandatory. See LSA–C.Cr.P. Art. 5. In the absence of proper notice, no discretion is given the trial judge as to the admission of an inculpatory statement.

Article 769 does contain a provision for discretion. The majority, in my opinion, erroneously transposes this discretion to Article 768.

I conclude the trial judge erroneously admitted the inculpatory statement. Hence, the only question remaining is whether or not the erroneous admission constitutes reversible error.

Article 921 of the Louisiana Code of Criminal Procedure provides:

"A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right."

Under this article, the conclusion of the majority that the ruling deprived defendant of no constitutional rights does not end the inquiry. Reversal is also warranted when there is a substantial violation of a statutory right. In my opinion, Article 768 sets forth a significant statutory right: the right to advance written notice of an inculpatory statement. The reason for notice is to permit the defendant to properly prepare to meet the issues that may arise from an attempt to use the statement against the defendant at the trial.

In the contested statement, the defendant used language that the jury could well con-

strue as an admission of the robbery. I conclude, therefore, that the statement prejudiced the defendant in the jury's consideration of the case. See State v. Silsby, 176 La. 727, 146 So. 684; State v. Jones, 230 La. 356, 88 So.2d 655; State v. Murphy, 154 La. 190, 97 So. 397; Hebert, Reversible Error in Louisiana, 6 Tul.L.Rev. 169, 189.

The charge against the defendant, armed robbery, is one that is especially abhorrent. Yet, it is highly important that the Louisiana Code of Criminal Procedure be faithfully applied. A substantial violation of defendant's rights has occurred. Hence, I would order a new trial.

For the reasons assigned, I respectfully dissent.