325 So.2d 819 (1976)
STATE of Louisiana
v.
Elbert STEWART.
No. 56931.
Supreme Court of Louisiana.
January 19, 1976.
*821 Quintin T. Hardtner, III, Shreveport, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John A. Richardson, Dist. Atty., for plaintiff-appellee.
CALOGERO, Justice.
Defendant Elbert Stewart was convicted of attempted second degree murder in violation of La.R.S. 14:27 and 14:30.1(1) and was sentenced to twenty years at hard labor. Approximately one month before his trial for attempted second degree murder, defendant was convicted of armed robbery arising out of the same incident. That earlier conviction is also before this Court and is the subject of our companion opinion, State v. Stewart, 325 So.2d 828 (La. 1976), No. 56,932 on docket of this Court, decided this date.
On the morning of January 17, 1974, a man exhibiting a loaded pistol robbed a branch of the Louisiana Bank and Trust Company in Shreveport, Louisiana. In the course of the armed robbery, five people, including Charles Schillinger, the victim in the present case, were shot and injured by the robber, and $822.00, including $100 in currency which contained a tracking device, was taken. After getting descriptions of the robber and of the blue Volkswagon in which he left the bank, a police officer, driving a car equipped with a receiver, picked up the signal of the tracking device. The officer drove in the direction of the signal, observed a blue Volkswagon with two occupants coming from the opposite direction down Jackson Street, and noticed a zero reading on the visiual equipment as the two cars passed each other. Looking in his rear view mirror, the officer saw the Volkswagon turn into the driveway of a house. The officer called for assistance, the house was surrounded, defendant and one Thomas Randolph were called out, arrested in front of the house and taken to the police station. About noon that same day a lineup was conducted during which the defendant was positively identified as the armed robber by two bank tellers and by a woman who was at her beauty parlor across the street from the bank and who saw the defendant leave the bank and proceed to his blue Volkswagon in the parking area. The tracking device, the bills assigned to the teller who had been robbed, and a pistol were found in a deep freezer underneath some groceries in the same house about 12:30 or 1:00 p. m. that same day. In the middle of the afternoon, the defendant signed a confession which was later introduced at the two trials, one on the attempted second degree murder charge which we review here and the other on the companion armed robbery charge.
Defendant appeals his conviction and sentence, relying on four assignments of error.
ASSIGNMENT OF ERROR NO. 1.
Defendant argues that the trial court erred in denying his motion to suppress all evidence seized during a purportedly illegal search of the defendant's house and automobile.
When the police officers arrived at the home of the defendant shortly after the armed robbery, they called for those inside to come out, after which the defendant and the companion Randolph came out of the house, were handcuffed and placed under arrest. The defendant's wife and several children also vacated the house and police officers made a sweep of the inside to make sure it was empty. The house was *822 then secured by placing guards at both the inside and outside of the front and back doors. At this point, approximately 9:30 a. m., the police officers and FBI agents involved had a discussion as to whether they should conduct a search incident to the arrest or obtain search warrants. It was decided that warrants should be sought from both state and federal authorities before the search was conducted. For the next three hours, from approximately 9:30 a. m. to 12:30 p. m., the guards remained at the doors and no one was allowed to enter except a few designated law enforcement officials. At approximately 12:30 p. m., the search warrants arrived, an official search was made, and a pistol, currency, and a money pouch containing the tracking device were found under some groceries in the deep freezer and were later used as evidence against the defendant at his trials.
During the three hours between the arrest and the arrival of the search warrants, several persons did enter the defendant's house. Police officers, FBI agents and others testified for the state that the only persons who entered the house during that time were the guards and persons using the telephone to obtain and verify information relative to probable cause and to transmit that information to the district attorney's office and the United States Attorney's Office for use in the separate applications for search warrants. The state argued that the use of the phones in the defendant's house was the most practical way to relay the information because the radios in the police cars were not equipped to contact either the state or federal prosecuting attorneys' offices. The fact that no one was allowed to enter the house except the guards and those authorized persons who used the telephone, and that no search was made either inside the house or of the car parked in the driveway before the search warrants arrived, was borne out by the testimony of sixteen police officers, FBI agents and others. The only testimony to the contrary was that of the defendant's brother who arrived at the house at about 10:15 a. m. Although he was not allowed to enter the house, he testified that he saw through windows and through the front door that drawers had been pulled out in the bedroom and that on at least one occasion the lid of the deep freezer was raised.
There are basically two issues before this Court. The first deals with the search itself, i. e., whether the search was conducted prior to the arrival of the search warrant and was thus a warrantless search, or whether the search took place only after the arrival and under the authority of the search warrants. The resolution of this issue involves the credibility of the witnesses. The second issue is, assuming the search took place after the warrants arrived, whether the fact that there were persons in the house before the warrants arrived tainted the search and seizure so as to require suppression of the evidence obtained.
The issue of credibility is easily resolved in favor of the state. A reading of the transcript of the hearing on the motion to suppress the physical evidence convinces us that the trial court was correct in disbelieving the testimony of the defendant's brother and in believing the multiple officers who testified that there was no search prior to the arrival of the warrants. This was no ordinary case. A bank had been robbed, five people had been shot by the robber, the defendant was tracked from the scene, observed pulling into his driveway and arrested immediately thereafter. Police officers, FBI agents, the police commissioner, and the Chief of Police were on the scene at the defendant's house and discussed whether or not a warrant should be obtained. Once these top level officials determined that a warrant should be secured, they took pains to see that the search was not conducted before its arrival by leaving guards on both the inside and outside of the front and rear doors and by restricting access to the house. The purpose of having guards on the inside was to *823 prevent a premature search from taking place. To refute the statements of the defendant's brother, there was testimony by an outside guard that a person could not see through the windows of the house, by the guard at the front door that from the front door there was no view into the bedrooms, and by the rear door guard who was standing near the deep freezer that no one raised the deep freezer lid until after the warrant arrived. The evidence adduced at the hearing on the motion to suppress the physical evidence more than amply supports the trial court's finding that the search was not conducted until the warrants arrived.
The defendant here correctly states the rule that when a person is arrested outside his home, a warrantless search incident to an arrest is not justified by the belief that an article sought is concealed within the house. See Vale v. Louisiana, 399 U.S. 30, 33-34, 90 S.Ct. 1969, 1971-72, 26 L.Ed.2d 409 (1970). However, this rule is not relevant in the present case because the trial court correctly held that no warrantless search (incident to the arrest) took place. Rather the search was not conducted until the warrants were issued. It would be an unrealistic extension of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) to hold that in a case such as we have here, the placing of guards inside the doors of defendant's house and the limited use of the telephone to transmit information concerning probable cause for the issuance of search warrants so tainted the subsequent warrant search and attendant seizure that the evidence obtained must be suppressed.
This case is clearly distinguishable from State v. DiBartolo, 276 So.2d 291 (La. 1973), which involved an illegal entry into a locked apartment and a warrantless search. In that case, it was information obtained after the illegal entry which gave the officers probable cause to arrest and search the defendant. Thus the illegal entry tainted the subsequent arrest so as to render the arrest illegal and the evidence seized incident thereto inadmissible in the defendant's prosecution. In the present case, the entry followed a lawful arrest and was merely to secure the house and to communicate information in order to obtain the search warrants. It was not alleged or shown that anything was found in the house which aided the police in establishing probable cause for the search warrant. Although in retrospect it might have been better to use a different telephone, perhaps that of a neighbor, we are not prepared to say that the limited occupation of the premises for the purposes stated here was unreasonable or has any legally damaging effect upon the subsequent search conducted pursuant to the warrant.
ASSIGNMENT OF ERROR NO. 2.
The defendant assigns as error the trial court's denial of his motion to suppress written confessions or inculpatory statements made on the day of his arrest. Defendant contends that the methods used in obtaining his signature were in violation of his privilege against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution and by Article I, Section 2, of the Louisiana Constitution of 1921 (which was in effect at the time the offense was committed).
It is undisputed that at the time of the defendant's arrest he was advised of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant was then taken to the police station where he was given an advice of rights form which he read, but declined to sign. At this point, the defendant requested a lawyer who was immediately called by one of the police officers. That lawyer was not in his office but his law partner came to the station, talked with defendant for about ten minutes, then departed. The defendant testified at the hearing on the motion to suppress written confessions that the attorney said nothing to him about not representing him and, at the hearing on the motion to strike the lineup, that he thought the attorney was still at *824 the police station representing him and that no one told him that the attorney had left. The police officer who called the attorney testified that the attorney had told him after the brief interview with defendant that he was not going to represent the defendant. At the hearing on the motion to suppress the physical evidence, this officer related that he told defendant what he had learned from the lawyer, but on cross examination he said that it was either defendant or the companion arrestee, Randolph, to whom he related the attorney's stated decision not to represent them. However, at the hearing on the motion to strike the lineup, the same officer testified that it was the defendant to whom he gave the information.
Later in the afternoon, after defendant took part in a lineup procedure, an FBI agent and another police officer spoke to defendant and again notified him of his Miranda rights. This time the defendant signed a waiver of his rights. The agent and officer then interviewed the defendant for approximately two and one-half hours and put together a statement in which defendant admitted his part in the robbery. About an hour of this time was taken up by the defendant attempting to write out his own statement. After the statement was written by the agent, the defendant began his signature but did not complete it, asking to speak to his wife. After speaking to her in private, the defendant added a sentence in his own writing exonerating his companion,[1] and affixed his signature in full.
At the hearing on the motion to suppress the written confession defendant testified that on the way to the police station the officer driving the car said he would shoot the defendant if he tried to escape and that when they arrived at the station he pushed the defendant up against the wall. Furthermore, the defendant testified that, after the lineup he said that he did not want to make a statement but that the officers repeatedly pressured him to make a statement; that the FBI agent promised to have the case tried in federal court and to get the defendant a doctor; and that the police officer pulled on his arm and shirt and made vague references to his family. The various officers and agents allegedly involved in these incidents affirmatively denied that these things took place.
In a motion to suppress a written confession or inculpatory statement, the state has the burden of proving that the confession was freely and voluntarily made and was not given under the influence of intimidation, threats or promises. La. Code of Criminal Procedure, Article 703. See State v. Bray, 292 So.2d 697 (La. 1974); State v. Wood, 262 La. 259, 263 So.2d 28 (1972). The state has met this burden in the present case.
Despite the defendant's testimony that he was subjected to physical abuse and was promised federal in lieu of state prosecution, and the assistance of a doctor the record abounds with testimony by police officers and FBI agents denying any such abuse or promises. Furthermore, the defendant was not injured during the commission of the robbery or subsequently. And, even assuming as true that he was offered a doctor, such could hardly be considered coercion in light of defendant's testimony that he did not know why such offer was made. It is undisputed that prior to the interview which culminated in the *825 signing of a statement, defendant was given his Miranda rights and signed a waiver of rights form. Both the police officer and the FBI agent who were present during the interview deny that defendant told them he did not want to make a statement.
It should be observed that when, shortly after his arrest, defendant requested an attorney, the officers involved ceased all questioning and called the attorney for defendant. It was several hours later that another officer and an FBI agent interviewed defendant and then only after he had been advised of his rights and signed a waiver form. The decision by the defendant to talk to the officer and agent came after he had spoken with an attorney and had taken part in a lineup. The actual signing of the statement followed a private conversation with his wife and the addition in his own handwriting, of a sentence exonerating his companion.
All of these facts indicate that there were no threats, promises or physical abuse and that the defendant voluntarily gave the statement. A factual determination by the trial court that the written confession was not the product of threats or promises and that it was freely and voluntarily made is given great weight and will not be disturbed upon appeal unless clearly erroneous. State v. Sims, 310 So.2d 587 (La.1975); State v. Cosey, 261 La. 550, 260 So.2d 620 (1972); State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970).
There remains, however, the issue of what effect the defendant's earlier request (that he talk with an attorney), and his asserted belief (that the attorney was representing him), have on the admissibility of the written confession. The guidelines for custodial interrogation established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) state:
"If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." 384 U.S. at 474, 86 S.Ct. at 1628.
Under the facts of this case, we conclude that defendant's Miranda rights were not violated. Defendant was twenty-six years of age at the time the offense was committed and had at least one year of college. The police did not desist from honoring defendant's decision to consult with an attorney. Instead, the police here respected that decision and immediately called the attorney. Although we do not know exactly what the attorney and defendant concluded with respect to legal representation, in light of the attorney's statement to a police officer immediately after their conversation that he would not be representing defendant and in view of defendant's later giving a statement without counsel present and on the heels of advice that he was entitled to have his lawyer present,[2] we conclude that at the time *826 of the interview which produced defendant's confession, defendant was not represented by an attorney and that defendant was aware of this fact.
Nor are we impressed with defendant's contention that after the interview in which he asked for a lawyer he should not thereafter have been questioned again. The two interrogation attempts were separated by the summoning of a requested attorney and the conducting of a lineup. Furthermore, we do not construe defendant's request for a lawyer followed by the lawyer's advising the police (as well as defendant, we have concluded) that he was not going to represent defendant, to be an expression that defendant did not choose to make a statement. Of course, any such expression that defendant did not choose to make a statement would have to be respected under Miranda.[3]
There is nothing in this case to indicate that fully effective means to notify the defendant of his right to counsel or his right to remain silent were not followed by the police officers and FBI agents, or that these rights were not carefully honored.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 3.
Defendant argues that the trial court erred in denying his motion to strike the lineup, and to suppress the testimony of any witness who viewed the lineup, on the grounds that the defendant was not advised of his rights to counsel prior to the lineup and was not advised by the investigating officers that the lawyer with whom he had talked prior to the lineup had declined to represent him. There is no allegation of any irregularity or unfairness in the formation or carrying out of the lineup procedure itself.
The lineup was conducted on January 17, 1974, several hours after the occurrence of the crime and the arrest of defendant. The bill of information charging defendant with attempted second degree murder[4] was filed four days later. Although the defendant was read a lineup rights form and advised of his right to have an attorney present, such is not required by either federal or state jurisprudence. In Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the United States Supreme Court held that the Sixth Amendment did not apply to preindictment lineups. Applying the Kirby decision, this Court has consistently held that the presence of an attorney is not required at lineups held prior to indictments or the filing of bills of information. State v. Nero, 319 So.2d 303, 308 (La.1975); State v. Bland, 310 So.2d 622, 626 (La.1975); State v. Lawrence, 294 So.2d 476, 478 (La.1974); State v. Edgecombe, 275 So.2d 740 (La.1973). Furthermore, as indicated in the discussion of the second assignment, defendant was not at the time represented by a lawyer and was aware of that fact.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 4.
The defendant assigned as error the trial court's denial of his motion for change of venue or, in the alternative, for a continuance of not less than six months. Because the alternative argument for a continuance was not argued on appeal, it *827 will not be considered by this Court. State v. Coleman, 322 So.2d 195 (La. decided Nov. 4, 1975); State v. Richmond, 284 So.2d 317 (La.1973).
The trial on the attempted murder charge began on March 31, 1975. Slightly more than one month earlier, on February 21, 1975, the defendant had been convicted of armed robbery arising out of the same incident. Defendant attached to his motion for change of venue copies of six newspaper articles reporting the trial on the armed robbery charge in the Shreveport Journal and the Shreveport Times. At the hearing on the motion, the defense did not attempt to introduce any other evidence, but chose to rest its case on the attached newspaper reports.
The grounds for change of venue are set forth in Article 622 of the Code of Criminal Procedure:
"Art. 622. Grounds for change of venue
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
In a motion for change of venue, the defendant has the burden of showing that he cannot obtain a fair trial in the parish where the prosecution is pending. State v. Dillard, 320 So.2d 116 (La. decided October 1, 1975); State v. Bell, 315 So.2d 307 (La.1975); State v. Richmond, 284 So.2d 317 (La.1973). Article 622 of the Code of Criminal Procedure requires more than mere knowledge by the public of the facts surrounding the offense. It requires, in addition, proof of such prejudice in the public mind that a fair and impartial trial cannot be obtained in the parish. State v. Dillard, supra; State v. Flood, 301 So.2d 637 (La.1974); State v. Leichman, 286 So.2d 649 (La.1973). In the present case, the defendant failed to meet his burden of proof. An examination of the newspaper articles published at the time of the armed robbery trial shows that none were inflammatory. They were merely objective coverage of the trial reflecting the testimony of the witnesses and the ultimate guilty verdict.
The present case is distinguishable from State v. Bell, 315 So.2d 307 (La.1975) where the conviction was reversed because the trial judge refused to issue subpoenas to news media representatives as requested by the defendant or to allow the introduction of evidence of the extensive publicity, thus precluding a fair determination of the community's attitude toward the defendant. Here both sides submitted the question on the newspaper articles which were attached to their motions as exhibits. The defense was not precluded from introducing other evidence.
The granting or denial of change of venue rests within the sound discretion of the trial judge and his ruling denying the motion will not be disturbed unless the evidence affirmatively shows that the ruling was erroneous and an abuse of judicial discretion. State v. Dillard, 320 So.2d 116 (decided October 1, 1975); State v. Richmond, supra. Under the evidence presented to support the defendant's motion for change of venue, we do not conclude that the trial judge abused his discretion.
This assignment of error lacks merit.
For the reasons assigned the conviction and sentence are affirmed.
NOTES
[1] On the morning of the bank robbery, Thomas Randolph left his pre-school child at the defendant's house and, because his car was broken down, was offered a ride to work by defendant. The two men left in the defendant's blue Volkswagon, but defendant said he needed to run an errand first. Defendant parked the car in the parking area of a grocery, crossed the street and entered the bank. Randolph remained in the car. After the robbery, Randolph returned to the defendant's house with him, was arrested and placed in a lineup with the defendant. Later that day defendant added a sentence to his statement indicating that Randolph was not involved, but was simply a victim of circumstances. The charges against Randolph were dropped.
[2] "INTERROGATION: ADVICE OF RIGHTS.

Your rights. Place: Shreveport, Louisiana, dated January 17, 1974. Time: 12:-48 P.M. Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time until you talk to a lawyer. Paragraph. Waiver of Rights: I have read this statement of my rights and I understood what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me Signed Elbert Stuart. Witness: Ronald W. Bienner, Special Agent, FBI, Shreveport, Louisiana, January 17, 1974. Time: 12:50 P.M." (Emphasis provided)
[3] But see the recent United States Supreme Court case, Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, where it was found that Miranda is not violated by an interrogation following an earlier refusal to give a statement where the interrogations related to separate and distinct crimes.
[4] This bill was originally for attempted first degree murder, but was amended to read attempted second degree murder. There was a separate bill of information charging the defendant with the armed robbery.